STATE of Missouri, Respondent,

v.

James Ben JOHNSON, Appellant.

No. 58221.

Supreme Court of Missouri,
En Banc.

July 14, 1975.

John C. Danforth, Atty. Gen., David Robards, Paul Robert Otto, Asst. Attys. Gen., Jefferson City, for respondent.

William M. Kunstler, New York City, Louis Gilden, St. Louis, Paul R. Hales, Clayton, for appellant.

WELBORN, Commissioner.

Appeal from judgment and sentence of life imprisonment, entered on jury verdict finding James Ben Johnson guilty of murder in the first degree.

At around 2:30 P.M., January 23, 1970, Robert Lee Walker entered the University Jewelers Store, 6360 Delmar Boulevard, University City, Missouri, and spoke to the proprietor, Adam Bakos, about buying a wedding ring. A second man entered and conversed with Walker. The two left together.

A short time later the two men returned to the store. Walker told Bakos he wanted to buy one of the rings he had seen. When Bakos handed him the ring, Walker pulled a gun and told Bakos to go to the back room. Before doing so Bakos stepped on a silent holdup alarm.

Bakos went to the back room where Walker ordered him to lie down and tied his hands and feet. Bakos heard the cash register in the front of the store open and heard the second man say, "Come on, let's go, I have got the stuff." Walker said, "Wait a minute. I want to get some stuff too." Bakos heard the front door close. As Walker was taking money from a safe in the rear, two University City detectives, responding to the alarm, entered the store. Gunfire was exchanged between them and Walker. One of the detectives, James Boevingloh, received fatal injuries. Walker was wounded and arrested at the scene. Walker received a life sentence on the charge of Boevingloh's murder.

Officer Kannenberg of the University City Police Department arrived at the scene of the robbery as Walker came out of the store. Kannenberg went to the rear of the store. There in the alley he saw footprints in the recent snow and paper money and currency near the footprints, which led across the yard of a residence fronting on Washington Boulevard. He saw a Negro male, wearing a yellow sweater and dark pants, going east on Washington.

Officer Bernard had driven into the alley. Kannenberg told him of the man he had seen on Washington and asked Bernard to put out a radio call describing the man and his movements. Bernard said that he and Kannenberg saw the man simultaneously. Bernard radioed the dispatcher that he thought he "possibly had one suspect" and drove east through the alley, parallel with Washington. He got glimpses of the man between buildings, sometimes running, sometimes walking fast. Bernard kept in radio touch with the dispatcher. When the man got to Washington and Skinker, Bernard pulled out of the alley onto Skinker. The man turned south and walked along Skinker to Kingsbury, where he crossed Skinker and entered a cab in a service station.

Bernard had followed the man along Skinker. Officer Dowling was in the vicinity to assist. When Bernard radioed that the man had gone to the service station and gotten into a cab, Dowling drove into the service station and placed the man under arrest. The man arrested was the appellant, James Ben Johnson. When the officer searched Johnson, he found no weapon. Johnson was carrying eight one-dollar and two five-dollar bills "in a wad" in his hand.

Dowling and another officer took Johnson to the police station. Officer Kannenberg was at the station and observed that the pointed toed shoes Johnson was wearing "appeared to be the same as the footprints in the snow" that he had seen in the rear yard of the Washington Boulevard residence. Officer Dowling removed Johnson's shoes. The officer testified that,

when he removed the right shoe, two rings fell out. Bakos identified them as rings taken from his store.

When Walker was arrested, officers found a registration certificate for a 1968 Pontiac coupe in his billfold. A police dispatch advised officers to be on the lookout for the vehicle. Some 30 to 35 minutes after he had received the first call about the holdup, Officer Didden found the Pontiac on a municipal parking lot a few doors to the east of the University Jewelers Store. The car was eventually towed to the police garage. There officers examined the interior and found in the rear seat numerous items of jewelry which had been taken from Bakos' store. A partial fingerprint on a ring tray found in the car was identified as Johnson's.

Later that afternoon or in the early evening, Bakos viewed a lineup in which Johnson and four other men appeared. Bakos did not identify Johnson and picked out another person as "resembling" the man with Walker.

Johnson testified at his trial that he had been shooting dice at Delmar and Clara in St. Louis. The game broke up when the police came by at around 3:00 P.M. An acquaintance of Johnson, Steve Horne, who had been in the game gave Johnson a ride out Delmar to Skinker. Horne and other companions in the car were on their way to Washington University. After the car turned left on Skinker, Johnson said he did not want to go to Washington University and Horne let him out of the car in the vicinity of Skinker and Washington. Johnson said he crossed Skinker, got into the cab and told the driver to take him to Delmar and Clara. Just then the police arrived and placed him under arrest. Johnson denied that he had the rings in his shoes. Horne testified in corroboration of Johnson's testimony. The cab driver testified that he saw Johnson cross Skinker and that he got in his cab. The driver noticed that Johnson had "crap money" in his hand and Johnson remarked, "Hustling was hard to-day." Johnson said he had been gambling. Just then the police arrived.

On this appeal, the first contention of appellant is that the state's evidence was insufficient as a matter of law to sustain the judgment of conviction.

Giving the state the benefit of the most favorable view of the evidence as this court must do on this appeal, the evidence made a submissible circumstantial case of appellant's guilt. Two men participated in the holdup. After stating "I have got the stuff" one leaves before the police arrive. Loot is found in the automobile of the participant captured at the scene. The auto is near an alley in which footprints and a trail of money are found, leading to Washington Boulevard. A man in a yellow sweater and dark trousers is observed on Washington. A police officer drives through the alley parallel to Washington and sees the suspect from time to time, between the houses and outbuildings. He sees the suspect emerge on Skinker and watches him cross the street and enter the cab where he is arrested. At the police station, rings taken in the robbery are found in appellant's shoes. His shoes are found to match the footprints in the snow, leading to the point where the officers first noticed him on Washington. Appellant's fingerprint is found on one of the ring trays taken in the robbery.

This evidence, if believed by the jury, forged an adequate chain of circumstances to tie appellant with the robbery.

Appellant strenuously attacks the credibility of major items of evidence offered by the state, but credibility is for the jury, not the reviewing court. Inconsistencies in the testimony of the police officers are pointed out, but they do not rise to the level of destroying the state's case.

If the evidence did make a submissible case that appellant was the second man in the robbery, it was adequate to sup-

port his conviction under the felony murder doctrine. The evidence would support the finding that he conspired with the actual killer to commit a robbery and that the killing occurred "in flight from the scene of the crime to prevent detection, or promote escape." State v. Adams, 339 Mo. 926, 98 S.W.2d 632, 637 [5] (1936); State v. Paxton, 453 S.W.2d 923 (Mo.1970).

On February 27, 1971, the trial court entered an order sustaining defendant's motion to require the state to furnish the defendant with copies of any and all "extrajudicial statements" made by defendant. The state produced nothing in response to the order.

The trial began on September 11, 1972, with the selection of a jury. The state's opening statement was made the next day. In the course of the statement, the assistant prosecuting attorney said:

"Now, [Officer] Dowling, in questioning James Ben Johnson after he finds the rings in his shoes, asked him, 'Where did you get them?' And at this time, of course, he thought he was talking to Hall, and James Ben Johnson also known as Hall said, 'I bought them downtown.' Well, when [Captain] Reich asked him, 'Where did you get the rings,' he said, 'I was shooting dice.' He told Reich also, 'I was never west of Skinker,' he said, 'I was out there shooting dice with some other boys and one of them, or one or two of them left the game for a while and they came back and one of them dropped the rings on the ground and I picked them up and put them in my shoe.' "

This statement elicited no response from defense counsel.

In the course of the state's case in chief, when direct examination of the state's witnesses led up to the statements, defense counsel raised the objection that no such statement had been furnished him. Voir dire examination of Officer Dowling and Captain Reich disclosed that statements along the line of those referred to in the opening statement had been embodied in a police report and furnished to the prosecutor. Defense counsel moved to exclude the statements. The trial court eventually sustained the motion, based on the state's failure to comply with the order to produce.

Defense counsel then moved for a mistrial, stating:

"Judge, at this time I am going to orally move that mistrial be granted and that the Jury be discharged on the grounds that the Defense and the Defendant has been irreparably prejudiced by that failure to comply with the order. Had I been furnished those copies in accordance with the order I would have drastically changed my position in the case; I am now faced with doing what I said I would do, such as testimony of the Defendant, and faced with the additional problem now of whether or not I can elude (sic) to what was said or whether I can ignore a question of rings, and faced with the problem of impeachment wherein the exact evidence that's been excluded would then come in on impeachment, and my position is that I have been irreparably and irrevocably prejudiced. And I can't correct it at this point, and I move that the Jury be discharged and a mistrial declared."

The motion for a mistrial was denied. No further reference to the statements was made in the state's case in chief.

The appellant testified in his own behalf. In response to questions from his counsel, appellant testified that Captain Reich participated in his questioning after his arrest. He testified that Captain Reich kept asking whether he was the man that did it and he denied that he was. He testified that Reich told him that if he would sign a confession and say that Walker was the man, they would probably let him go. According to appellant, he rejected such propositions. On cross-examination, the prosecutor asked appellant whether or not Captain Reich questioned him about where he got the two rings the police claimed to have

found in his shoes. Defense counsel objected to the attempt to impeach appellant with a statement that had been stricken. The court overruled the objection and overruled a motion for mistrial, based upon the court's approval of the question the prosecutor proposed to ask. The following question was then put to appellant:

"Mr. Johnson, you testified on direct while you were being questioned by Mr. Schwartz that Captain Reich of the University City Police Department questioned you about your part in the robbery. Isn't it a fact that Captain Reich asked you what was your part in the robbery and shooting, and to that didn't you reply: I was never west of Skinker; I came to University City in a car with Frog and two other colored men to shoot dice; Frog and one or two of the other colored men left the game for a while and Frog came back and dropped the rings and I put them in my shoe."

Appellant responded: "No, I didn't."

In rebuttal, the state called Captain Reich, who, over objection, testified to the statement appellant made.

On this appeal, appellant contends that the trial court erred in failing to grant a mistrial when the nondisclosure by the state appeared and also in permitting Captain Reich to testify in rebuttal, making use of the previously excluded statement.

At the time this case was tried, Supreme Court Rule 25.195, V.A.M.R., was in effect. That rule, permitting discovery of a defendant's statement, had no expressed sanctions. The presently effective rules of discovery in criminal cases include Rule 25.45, which provides:

"If at any time during the course of the proceeding it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to make disclosure of material and information not previously dis-

closed, grant a continuance, exclude such evidence, or enter such other orders as it deems just under the circumstances. Wilful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court."

Although not so expressly stated at the time here involved, the trial court's responses to the objections before it were, nevertheless, a matter for its exercise of discretion.

■ Although the discovery process in criminal proceedings is not compelled by either federal or state constitutional requirements (23 Am.Jur.2d § 312, Depositions and Discovery (1965)), the basic object of such process, insofar as a defendant is concerned, is to permit the defendant "a decent opportunity to prepare in advance of trial," and thus extend to him the fundamental fairness which the adversary system aims to provide. State v. Scott, 479 S.W.2d 438 (Mo. banc 1972).

If the trial court feels that failure to produce on the part of the state will result in fundamental unfairness to the defendant, one of the sanctions it may employ is to exclude the unproduced statement. That was the original response of the trial court here. If such exclusion is enforced throughout the trial, it is difficult to perceive how the mere existence of the unproduced but excluded testimony is prejudicial to the defendant. Certainly the trial court is not required to apply the drastic remedy of a mistrial simply because the statement has not been produced.

The problem of fundamental fairness which the rule is designed to foster will ordinarily arise only when the content of the statement is made known to the jury. The jury in this case did receive the excluded statement in the guise of impeachment testimony. The court also, at the suggestion of defendant, gave an instruction to the effect that evidence of out-of-court statements of the defendant was offered

only for the purpose of "whatever effect they might have as to his credibility * * *."

The trial court evidently was impressed by the argument of the prosecutor that the situation was analogous to that in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), in which the Supreme Court held that a statement of a defendant, inadmissible in the state's case in chief for failure on the part of the police to comply with the requirements of Miranda, might be used on cross-examination of the defendant, for purposes of impeachment.

In State v. Bea, 509 S.W.2d 474 (Mo. App.1974), the Missouri Court of Appeals, St. Louis District, found such analogy convincing in a case involving the use of a statement, excluded for nonproduction, for impeachment of a defendant who testified in his own behalf. In that case, the court reasoned as follows (509 S.W.2d 476–477):

"Thus we reach the threshold question, may a defendant be impeached by a prior inconsistent statement which the court had suppressed because the state had failed to permit discovery in obedience to the court's order to permit an inspection. We deal here with neither a statement that was suppressed because it was the product of an in-custody interrogation where the interrogator failed to give the Miranda warning. Nor do we deal with a statement which claims to be coerced or involuntary. See Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), where the prosecutor was permitted to impeach the defendant's credibility by the use of a confession that had been suppressed in the state's case in chief for failure to observe the procedural safeguards of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). Although the Harris case, supra, is not altogether analogous, the same principle is applicable; i. e., any material prior inconsistent statements may be shown to impeach a defendant's credibility, and the shroud of protection given defendant by sustaining his motion to suppress because of a breach of duty on the part of the state should not be perverted into a license for a defendant to use perjury by way of a defense, free from the risk of confrontation with prior material inconsistent utterances. Here, defendant testified that he did not carry a hammer for protection; and did not carry it with him as a weapon at the time he visited the Dillard home. Furthermore, he testified that he ran to his car to obtain the hammer to protect himself from a knife assault by Mr. Dillard, and that after Mr. Dillard fled, he was confronted by the victim who put into fear for his own life because she brandished a pistol. All of this testimony not only was material, but necessary to establish defendant's right of self-defense. The court was placed in a dilemma. Was it to permit the positive assertions of defendant to go unchallenged by the state, and thereby pervert justice? We think not. We hold that it was proper for the state under the circumstances of this case to use defendant's previously suppressed statements to attack his credibility in order that the jury could not only properly evaluate his testimony, but also aid them to reach a just verdict. To hold otherwise is to permit defendant to assume a virtue which according to the evidence he possesses not."

There may well be instances in which the state's interest in preventing the defendant's allegedly perjurious testimony from going unchallenged should prevail over the policy considerations behind the disclosure rules. State v. Bea, supra, may well have been such a case. The opinion does not disclose whether or not the state's case in chief had shown that the defendant came to the scene of the difficulty armed with the hammer. Had it not done so, to permit the defendant to testify as he did in support of his self-defense claim might well have left the jury with a false state of facts which the state would not controvert without the use of the suppressed statement.

Such was not the situation here. The state had direct evidence that the rings had been found in appellant's shoes. The appellant had denied that the rings were in his shoes. If the appellant had committed perjury by his testimony, the evidence was already before the jury and the statement was not necessary to destroy his claim.

Insofar as the "fundamental fairness" which the rule is designed to promote, the differentiation between the use of the statement in the state's case in chief and on rebuttal is practically a difficult matter. The court did instruct the jury that the evidence of the statement involved only the defendant's credibility. However, when the impeaching statement goes directly to the guilt of the defendant and not to a collateral matter (see United States v. Skillman, 442 F.2d 542, 550 [7] (8th Cir., 1971)), to expect a jury to apply such a limiting instruction requires that general human reaction be ignored. Compare Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The fact that the evidence occurs late in the case may, in fact, well serve to leave a stronger impression upon the jury.

■ Essentially, what is called for, whether the use of an undisclosed statement is sought either in a case in chief or in rebuttal is a proper exercise of discretion by the trial court. In this case, when the question of use of the statement first arose, the trial court concluded that the defense had committed itself to a position at the trial which would have produced a fundamental unfairness had the state been permitted to employ the undisclosed statement in its case in chief. Having thus found the dereliction on the part of the state and prejudice to the defendant, the trial court should have required a showing by the state of a necessity for the use of the statement in rebuttal which overcame the fundamental unfairness previously adjudged.

The state's reliance was upon the fact that on direct examination defendant had testified that Captain Reich had told him that if he would sign a confession they would let him go. The state contended that this gave them the right to impeach by showing the entire conversation between Reich and the defendant. The state was obviously using this argument in order to gain the benefit of the officer's testimony about the rings. The defendant testified to no conversation with Reich about the rings. He possibly could have been impeached by Reich's testimony that he did not tell defendant that if he would sign a confession, he would be allowed to leave. However, the state was not content with that and convinced the trial court that as a matter of law it had the right to use the excluded statement.

The trial court's response to the prosecutor's argument and appellant's objection was addressed to the prosecutor: "I will take a chance with you." Such a ruling does not evidence a proper exercise of discretion so that the trial court's action is not here subject to review only for abuse of discretion. See Laws v. City of Wellston, 435 S.W.2d 370, 375 (Mo.1968). Absent a ruling on such basis, this court concludes that the fundamental unfairness found on the original ruling was not overcome and the admission of the statement in rebuttal over the objection of the defendant was prejudicial error.

The state argues that the admission of the statement should not be held reversible error because of the failure of defense counsel to raise the question when the prosecutor's opening statement revealed the existence of the appellant's statement. Adequate answer to this contention is found in the fact that this consideration, along with the state's excuse for nonproduction —the death of the assistant prosecutor handling the case at the time of the order to produce—was before the trial court at the time of its ruling on the original objection in the course of the state's case in chief. The trial court did not consider the revelation of the statement in the opening

statement adequate compliance with the order.

The state also argues that this court should follow the reasoning of Harris, saying " * * * this court is bound to follow the decision of the Supreme Court of the United States * * *." This obligation extends only to matters of construction and application of federal constitutional and statutory provisions. As above pointed out, the case involves the construction and application of the rules of this court so that there is no requirement that this court adopt the reasoning of Harris.

Other points of error advanced by appellant should not recur on a new trial and require no consideration on this appeal.

Reversed and remanded.

PER CURIAM:

The Division One opinion by WELBORN, C., is adopted as the opinion of the Court en Banc.

SEILER, C. J., and MORGAN, BARDGETT and DONNELLY, JJ., concur.

HOLMAN, J., dissents in separate dissenting opinion filed.

HENLEY and FINCH, JJ., dissent and concur in separate dissenting opinion of HOLMAN, J.

HOLMAN, Judge.

I respectfully dissent for the reason that I think the court ruled correctly in permitting the foundation for impeachment to be laid during the cross-examination of defendant and thereafter in admitting the impeaching testimony of Captain Reich. It is my view that this evidence was admissible as a matter of right and that its admission was not dependent on an exercise of the court's discretion.

At the time the trial court made the order directing the state to furnish a copy of the statement and at the time of trial there were no sanctions provided in our rules for violation thereof. However, in State v. Scott, 479 S.W.2d 438 (Mo.1972), it was held that the failure to furnish such a statement rendered the trial fundamentally unfair where evidence thereof was admitted on the state's case in chief. No doubt, in reliance upon Scott the trial court in this case ruled that the state could not prove the statements on its case in chief. In so doing, it complied with the requirements indicated by the Scott decision. However, the situation was entirely different when the evidence was sought to be offered in impeachment of the defendant. Section 546.260, RSMo 1969, V.A.M.S., provides that when a defendant testifies in a criminal case he "may be contradicted and impeached as any other witness in the case." One of the most commonly used methods of impeaching a witness is to lay the foundation during cross-examination and then in rebuttal prove that he made the inconsistent statements he had denied making. State v. Elbert, 471 S.W.2d 170 (Mo.1971).

It has often been said that the right of cross-examination is accepted as a universal right, a right basic to our judicial system and one of the most valuable rights given by the law. The right to prove inconsistent statements that the witness has denied on cross-examination is a necessary extension to the right of cross-examination. These two rights, when combined, provide perhaps the most effective truth searching device known to the law. There is an abundance of authority supporting the action of the trial court in permitting that procedure to be followed in this case.

In Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1953), the use of heroin had been suppressed in a prosecution and thereafter the case had been dismissed by the government. In a later prosecution for another narcotics offense, the defendant testified that he had *never* had any narcotics in his possession. In

that situation the court permitted a foundation to be laid and later proof to be made that the suppressed narcotics had previously been in the possession of the defendant. The Supreme Court, in ruling that such was proper, stated that, "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment."

In Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1970), the defendant had made a statement to the police and upon the trial of the case the state offered the same in evidence but it was ruled inadmissible because the police had not complied with *Miranda*. Thereafter, the defendant testified to facts inconsistent with those contained in his statement to the police. In cross-examining the defendant the court permitted the state to question him concerning the statement, the prosecutor reading various questions and answers in that impeaching process. The trial judge instructed the jury that the statements attributed to defendant could be considered only in passing on his credibility and not as evidence of guilt. In ruling that the court did not commit error the Supreme Court stated that, "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See United States v. Knox, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); cf. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had in-

consistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." As indicated in the principal opinion the court of appeals in State v. Bea, 509 S.W.2d 474 (Mo.App.1974) adopted the Harris rule in a case almost exactly like the one before us.

In summary, it is my view that the court clearly ruled properly in permitting the evidence in question to be admitted and that such ruling is supported by the Walder, Harris and Bea cases heretofore discussed.

Assuming, for the purpose of discussion, that the principal opinion is correct in saying that this was a matter for the court's discretion in determining whether the showing would be permitted, I am strongly of the opinion that the court exercised a sound discretion in this instance. The principal opinion quotes a statement of the trial court which indicated that the court was relying upon the research of the prosecuting attorney in permitting the evidence to be admitted. The principal opinion concludes therefrom that the court did not properly exercise its discretion in that regard and therefore the trial court's action was not subject to review for abuse of discretion only. In that regard the principal opinion does not fully and fairly disclose the situation. When the state sought to lay the foundation by cross-examining the defendant, defendant's counsel objected. Thereafter, there was a lengthy argument of counsel concerning the matter, which covers eight pages of the transcript. At the conclusion of that argument, the court made the statement in question and overruled the objection. Immediately thereafter and before the evidence was admitted, defendant's counsel made a motion for a mistrial which caused the court to recon-

sider the matter, and, although it was apparently prior to the time of regular adjournment, the following occurred:

"THE COURT: I tell you what I am going to do, Gentlemen; I am going to recess this case until tomorrow morning at 9:30, and you and I and the court reporter are going into my office and discuss this problem.

"Mr. Schwartz: I will research it.

"THE COURT: And then we will come to a conclusion. All right; I think it is a fine point; I don't want to rush too hastily."

Upon convening the next morning the court, indicating a familiarity with Harris v. New York, permitted the ruling to stand. The above very clearly indicates that the court gave thorough consideration to this question and after an over-night recess decided it was proper to permit the jury to hear the evidence. In that situation the judge definitely exercised a discretion and we should review solely upon the question of an abuse thereof.

At the conclusion of the testimony of Captain Reich the court, at the request of defendant's counsel, gave the jury the following verbal instruction:

"THE COURT: Ladies and Gentlemen of the Jury, the Court instructs you that the evidence of the statements should be considered only in passing on the accused's credibility and not as evidence of guilt." Also, Instruction No. 7 given by the court reads as follows:

"The Court instructs the jury that any evidence of statements by defendant out of this Court, if you so find, is offered merely for the purpose of whatever effect they might have as to his credibility and should not be considered by you as any evidence of his guilt."

The action of the court in giving these instructions is precisely what was done in Harris, supra, in which case, as heretofore stated, the Supreme Court approved a ruling of the trial court similar to that made in the instant case.

I think these limiting instructions definitely would tend to confine the jury's consideration of the statements to the appropriate subject of impeachment. I strongly disagree with the statement in the principal opinion indicating that the jury could not be expected to apply those limiting instructions. That statement is contrary to hundreds of decisions of the appellate courts of this state which have said that at varying stages of the trial an admonition to the jury to limit the effect of certain evidence or to disregard certain evidence, arguments or statements, would dispel any prejudice that might otherwise occur.

As indicated, I would rule that the court properly admitted the evidence in question. Assuming that there are no other points which would require a reversal, I would affirm the conviction.