STATE of Missouri, Plaintiff-Respondent,

v.

Leonard T. WENDELL,
Defendant-Appellant.

No. 36998.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Dec. 14, 1976.

Motion for Rehearing or Transfer
Denied Feb. 16, 1977.

Application to Transfer Denied
April 11, 1977.

Taylor, Eichner, Hollander & Platke, F. Dianne Taylor, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

KELLY, Presiding Judge.

Leonard T. Wendell was found guilty by a jury and convicted of Robbery in the First Degree by Means of a Dangerous and Deadly Weapon, §§ 560.120 and 560.135 RSMo. 1969. The trial court found that he had

previously been convicted of a felony and was therefore subject to the Second Offender Act provisions, § 556.280 RSMo. 1969, and sentenced him to confinement in the custody of the Missouri Department of Corrections for a term of twenty-five years. After his timely motion for new trial was overruled and judgment entered, he appealed. We affirm.

 On appeal Mr. Wendell (hereinafter the defendant) raised seven Points of alleged trial error which he contends entitle him to a reversal of his conviction and remand of the case for a new trial. However, in oral argument in this court his counsel conceded that two of these seven Points of alleged error were without merit and we shall for that reason consider the remaining five Points for resolution of defendant's contentions.[1]

Defendant does not challenge the sufficiency of the evidence to support the verdict of the jury and for that reason a shortened version of the facts as they could have been found by the jury in support of its verdict will be sufficient. From the evidence the jury found that on Saturday morning, March 9, 1974, at approximately 11:30 a. m. Victor S. DeWitte was working as a salesman at Santo's Men's Wear at 2651 Charokee Street in the City of St. Louis, along with two others, Ms. Ann Herrell—a coproprietor of the business—and Randy Richert, an employee, when the defendant entered the store and perpetrated a robbery by means of a dangerous and deadly weapon, a gun. According to the State's evidence the defendant took $250.00 from the cash register, placed it into a bag, and then left the premises.

Defendant's first two points upon which he relies for reversal of his conviction and remand for a new trial are that the State knowingly provided him with false and misleading information as a part of discovery, thereby denying him due process of law, and the trial court thereby erred in denying his request for a mistrial. According to the defendant, there were pending against him at the same time two charges, one of which was the case before us, and he was represented by different counsel in each case. A request for pre-trial discovery was made and during preparation of the case for trial the assistant circuit attorney handling both cases made an agreement with his counsel that "police reports" would be furnished them relative to both cases. Despite this agreement one police report which was relevant and material to the issues in this case, was not furnished counsel until the trial of this case had been commenced and then only after its existence and materiality was discovered during the testimony of a State's witness. By failing to furnish defendant's counsel this police report his counsel was unable to become aware of some matters contained therein which, had she known, would have caused her to conduct an investigation about prior to trial and prepare a defense thereon. He also argues that the failure to furnish this police report to defense counsel prior to the time the prosecutor did deprived counsel of an opportunity to conduct cross-examination of witnesses in an effort to have their identification testimony at trial suppressed on the grounds that the identification of defendant as the robber was tainted by police procedures which tended towards a mistaken identification.

Defendant's counsel does not contend that the failure of the assistant circuit attorney to furnish her the copy of the police report was in bad faith and concedes that it came about as the result of a misunderstanding. Nevertheless, she argues that the defense was prejudiced by the failure to

---

1. The two Points abandoned by defendant's counsel, Point IV and Point VII, were that the trial court erred in overruling his motion to suppress identification because he was not afforded counsel at the lineup and that the verdict was against the weight of the evidence. The latter specification preserves nothing for review, *State v. Thomas*, 530 S.W.2d 265, 268 (Mo.App.1975). And the former is without merit because the lineup about which he complains was conducted prior to the filing of any charge against him, and under those circumstances he had no constitutional right to counsel at that stage of the proceedings. *Morris v. State*, 532 S.W.2d 455 (Mo. banc 1976).

furnish her this report as we have heretofore stated, and this deprived her client of due process of law.

The conviction of the defendant hinged on the identification testimony of two of the eye-witnesses present at the time of the robbery. Mr. DeWitte and Ms. Herrell testified at the trial and identified the defendant as the robber. The third eye-witness, Mr. Richert, did not appear and his name was stricken as a witness because at the time of trial he was a patient in a hospital following surgery. The defendant was not arrested until approximately the 22nd day of March, 1974, and there is no evidence that any of the proceeds of the robbery nor a weapon was found on his person at the time of the arrest.

The "missing" police report—that of March 16, 1974—assumes importance because of those portions of the report which conflict with police reports dated March 9, 1974, and March 23, 1974, which were delivered to defense counsel in conformity with the agreement between the assistant circuit attorney and defense counsel that he would furnish defense counsel with "police reports."

The procedural chronology necessary to a disposition of defendant's appeal on these two Points is that on April 10, 1974, after the Information charging Mr. Wendell in this case was filed in the Circuit Court, an assistant public defender entered his appearance as attorney for the defendant and on that same date the defendant was arraigned and entered a not guilty plea. On May 3, 1974, the assistant public defender in his capacity as attorney of record for defendant filed a letter with the trial court addressed to someone in the Office of the Circuit Attorney stating that the writer had been advised that the Office of the Circuit Attorney had agreed to make available to defense counsel, without the necessity of filing Motions to Discover, certain information ordinarily available through the discovery process. A request was made that

the addressee advise the writer at his earliest convenience whether he had "Descriptions of the offender given by the victim and eye witnesses as contained in the police report or elsewhere." (Other information was requested but it is not relevant to the Points on appeal). Subsequently, on November 20, 1974, trial counsel, who had, in the interim, been retained by defendant to represent him on this charge, entered her appearance as attorney of record for the defendant. Thereafter, she and the attorney representing defendant on the other charge pending against him, commenced conversations with the assistant circuit attorney handling both cases in order to obtain copies of police reports relative to the two cases and the assistant circuit attorney agreed to furnish them "police reports" and also to show them his file. Sometime thereafter, when, the record does not reveal, the assistant circuit attorney mailed to defense counsel here photostatic copies of two police reports, those dated March 9, 1974, and March 23, 1974. He did not send her a copy of the police report of March 16, 1974, although he had it in his file at that time.

The opening paragraph of the March 23, 1974 police report reads as follows:

"Supplemental to the above captioned Armed Robbery Report wherein the employees of Santo's Men's Shop (sic) 2651 Cherokee, reported that they were robbed by an unknown white male, all of which is self-explanatory in the original report, wish to state the following information.

Attention is now directed to a supplemental report bearing CN 40584 dated 3–15–74[2] wherein it was reported that Detective James Enright DSN 3283 and Wayne Thornberry DSN 5482 of the Third District conducted a followup investigation. The officers contacted the victims after they were informed by one of the robbery victims, Stanton Dewitt, (sic) that at about 9:30 PM on *3–13–74* he observed a subject seated at the bar whom he recognized (sic) as the subject

2. This police report was introduced into evidence as Exhibit B–1, but is dated "3–16–74," and inspection of the report shows that a "6"

at sometime was typed over what was originally a "5."

who robbed him at his place of employment. *He further stated that he overheard the wanted subject call for a cab and instruct the cab company to have the driver ask for Pete.* He then called the police, however, the subject had departed the scene before the arrival of Detectives Lloyd Perry 6818 and Theodore Love 7301. Detectives Love and Perry then conducted a further investigation and contacted Mr. James Mitchell, a Supervisor for Laclede Cab, who informed them that Cab # 226 had picked up a fare at the Du Bowl Lounge and conveyed the subject to 1718 Missouri." (Emphasis supplied).

According to this same police report Detectives Lloyd and Perry conducted a further investigation at 1718 Missouri Avenue without success and that Detectives Enright and Thornberry had the victims view a photo album containing photos of 500 known police characters and that "Ann Sternberg" (Mrs. Herrell's maiden name) and "DeWitt Stanton" "tentatively identified" a photo of one Michael Berry and stated that Berry "closely resembled" the wanted subject, except that the photo of Michael Berry showed him with a beard and mustache whereas the robber was clean shaven. The report continued that subsequently Detectives Enright and Thornberry learned that the defendant had been arrested for a robbery in the Sixth District, and being aware of the fact that he used the nickname "Pete," was known to be a frequenter of the Third District, and fit the description of the robber of the Men's Shop, they obtained and displayed photos of the defendant and two others to the victims of the robbery and all three identified the defendant as the robber. After this, the report said that a lineup was conducted at police headquarters that same day and the victims, after viewing the lineup separately, identified the defendant as the one who robbed them, pointing out that on the day of the robbery he had his hair combed back out of his face, but that during the lineup he had his hair combed down over his forehead. The report closed by stating that the defendant was advised of his rights in the presence of

the victims and was questioned in their presence but denied that he was the one who committed the robbery, and "Upon hearing the voice of the subject Wendel (sic) all three victims stated his voice was identical to that of the holdup man."

The police report of March 16, 1974, prepared by the same police officers who prepared the report of March 23, 1974, differed in four respects. According to the report of March 16, 1974, the date on which Mr. DeWitte reported seeing the robber at the DuBowl Lounge was "3–12–74," at about "11:00 PM." It also reported that Mr. DeWitte told the police officers that the man he observed at the DuBowl Lounge was wearing the same clothes he had worn at the time of the robbery. This report also contained no reference to any statement by Mr. DeWitte that he heard the man at the lounge instruct the cab company to have the driver ask for "Pete" upon his arrival at the Lounge. A fourth discrepancy in the two reports was that the report of March 16th stated that Mr. DeWitte was at the DuBowl Lounge on the 12th with Randy Richert whereas the report of the 23rd stated that it was Mr. Vaden, another co-proprietor of the Men's Shop, who was with Mr. DeWitte at that time.

According to defense counsel, she first became aware of the existence of a police report of which she had not been furnished a copy during the course of the trial, but exactly when is not clear. She commenced the trial prepared to furnish an alibi for the defendant on the date and time of the alleged robbery and also had witnesses who would testify that the defendant was not at the DuBowl Lounge on the night of March 13, 1974, when Mr. DeWitte had informed the police officers that he had seen the man who committed the robbery on the 9th according to the March 26 police report.

The trial was commenced on January 27, 1975. In a pre-trial discussion in Chambers the fact that the defendant's Motion to Suppress Identification had not as yet been heard was brought up by the trial court and it was decided that it would be taken up after the jury was selected to try the case.

During the evidentiary hearing on the Motion to Suppress Identification and while defense counsel was conducting direct examination of Detective James Enright it was developed that Mr. DeWitte had told the police officers, according to the police report of March 16, 1974, that it was on the evening of March 12, 1974, that he saw the man who robbed him and notified the police of that fact. Mr. DeWitte was offered as a witness by the State on defendant's Motion to Suppress, and he testified that the next time he saw the robber was at the DuBowl Lounge on the Tuesday following the robbery—March 12, 1974, at approximately 9:30 p. m. During cross-examination of Mr. DeWitte defense counsel inquired if he could say with absolute certainty that the man he saw "on March 13th in the DuBowl Lounge" was the man who robbed the clothing store. He replied that it was. Again at another part of Mr. DeWitte's cross-examination and when a reference was made to the lighting conditions at the DuBowl Lounge on "March the 13th" the witness responded to the question without commenting about the accuracy of the date included in the question directed to him. At the conclusion of Mr. DeWitte's testimony the trial was adjourned until the following morning when the testimony of Ms. Herrell was obtained and Detective Enright was recalled by defense counsel and it was developed that two supplementary police reports prepared by Detective Thornberry had been filed in the course of their investigation of the robbery. At the conclusion of Detective Enright's testimony defendant's Motion was denied.

The jury was then sworn and the trial of the case commenced. During the State's case in chief Mr. DeWitte again reiterated his testimony given on the Motion to Suppress that it was on the Tuesday following the robbery that he next saw the robber at the DuBowl Lounge at approximately 9:30 p. m. when Mr. James Vaden was there with him. On cross-examination defense counsel asked Mr. DeWitte if he remembered the exact date in March that he was in the DuBowl Lounge. He again testified that it was on the Tuesday following the

robbery, "the 13th I guess." When again asked "The 13th?" he replied: "Would that be right? The 12th I guess." Although Mr. DeWitte seemed somewhat confused about the date, he was certain that it was on the Tuesday following the robbery. The robbery occurred on Saturday, March 9th, 1974, the following Tuesday is March 12, 1974.

After Mr. DeWitte's testimony was concluded, Ms. Herrell testified and at the conclusion of her direct testimony a recess was taken for lunch. After the luncheon recess defense counsel requested a conference at which time she advised the trial court that she had noticed that the "beginning paragraph of the police report dated March 23, 1974," contained a reference to a supplemental report and that "yesterday" she had asked the assistant circuit attorney about this because she had not seen that report. According to defense counsel the assistant circuit attorney told her that report was essentially the same as the one she had. She thereupon advised the trial court that while she had an alibi for the defendant for the 13th of March, due to the testimony of the witnesses, she and her associate checked and determined that the Tuesday following the robbery was the 12th of March, and that when she asked the assistant circuit attorney to again check the report which had not been furnished her, he did so and replied: "By the way, this date is incorrect. It was March 12th he was seen at the DuBowl Lounge and this is a typographical error."

A lengthy discussion followed between the trial court, defense counsel and the assistant circuit attorney concerning the failure of the assistant circuit attorney to furnish defense counsel with the March 16th police report. The explanation given by the assistant circuit attorney for not furnishing defense counsel the report of March 16th was that at the time defense counsel entered her appearance in the case the request for discovery had already been made and eventually he did mail her two copies of police reports but did not mail her the third report—that of March 16th—because he had determined that the report contained

some errors through conversations he had with the police officers, and he could not therefore "stand for the accuracy" of the police report.

The trial court then inquired what defense counsel wanted done and a request for mistrial followed. The reason for the mistrial, according to defense counsel was that she needed time to find out from her client where he was on the 12th of March, 1974, in view of these developments, and this date change with respect to the Du-Bowl Lounge incident changed the complexion of the defense. The trial court directed the assistant circuit attorney to surrender to defense counsel a copy of the March 16th police report, denied defense counsel's request for a mistrial and continued the case until the following morning at 11:30 a. m. to permit defense counsel to prepare to proceed with the trial.

The following morning, January 29, 1975, defense counsel again renewed her request for a mistrial stating that her client's cause was prejudiced because if she had been armed with the information contained in the police report of March 16, 1974, at the time the Motion to Suppress was presented she could have used the discrepancies in the police reports and the tentative identification of Michael Berry in support of the Motion. She also argued that the difference in the dates of the 12th and 13th of March affected adversely her trial preparation. The defendant's Motion for Mistrial was denied and the trial proceeded.

When the trial proceeded Ms. Herrell was recalled at the defense's request and cross-examined. During this cross-examination the defense developed from this witness the fact that on Thursday following Tuesday, March 12, 1974, she viewed an album of photographs brought to the store by the police officers and that among those photos she saw the picture of Michael Berry whom she told the police officers resembled the robber. Ms. Herrell also testified that Mr. DeWitte, who was in the store when the police officers were there with the photo album while she was viewing the pictures, also pointed out the photo of Michael Berry

as a picture of a man resembling the robber.

Detective Wayne Thornberry testified that he was the police officer who prepared the police report of March 23rd and signed both his name and that of Detective Enright to that report. He testified that it was Detective Enright who prepared the police report of March 16, 1974, and signed both his and Enright's name to that report. According to Detective Thornberry this was their practice when they were busy. Evidence concerning the extent of these police officers' investigation of Michael Berry as a suspect in this robbery was elicited from this police officer witness by defense counsel and the tentative identification of Mr. Berry from the album of police department photos by both Ms. Herrell and Mr. De-Witte, together with their statement that the robber was clean shaven whereas the picture of Mr. Berry showed him wearing a beard and a mustache. The fact that an arrest warrant was issued for Michael Berry was also brought out as was the subsequent cancellation of the arrest warrant when Mr. Berry could not be located and placed under arrest after this defendant was in custody.

Detective Thornberry explained the discrepancies in the two police reports during the course of his testimony. With respect to the difference in the dates on which the robber was reported seen in the DuBowl Lounge, he said this was due to a typographical error or because he had the dates mixed up in his mind when he made up the reports. It was his recollection that Mr. DeWitte told him that it was on the 12th of March that the robber was seen at the DuBowl Lounge. He also testified that the information that the robber suggested that the cabbie ask for "Pete" upon his arrival at the Lounge was obtained by two other detectives, Love and Perry, who got it from the dispatcher at the cab company. He also testified that the mistake in the report prepared by Detective Enright which recited that Mr. DeWitte and Mr. Richert were at the DuBowl Lounge on March 12th when the robber was again seen was cleared up

by Mr. DeWitte who informed him that it was Mr. Vaden who was with him drinking beer at the DuBowl Lounge that night and not Mr. Richert, because Mr. Richert was not old enough to drink.

Mr. DeWitte was recalled by defense counsel for further cross-examination about his statement to the police that the photo of Michael Berry resembled the robber and he testified that at the time he made that statement he was "only thinking of the eyes itself." On re-direct examination Mr. DeWitte identified the defendant as he was sitting in the courtroom as the man who robbed him and further reiterated that it was Mr. Vaden, not Mr. Richert, who was with him at the DuBowl Lounge on the night of March 12th, 1974.

The defendant did not take the stand in his behalf, but the defense produced evidence tending to establish alibi. To refute the State's evidence that it was the defendant who robbed the Men's Store, the defense offered the testimony of two of defendant's friends that he was, at the time of the robbery, at the Whiskey-a-go-go tavern some distance from the scene of the robbery. In response to the testimony that the defendant was present at the DuBowl Lounge on the night of the 12th of March, 1974, the same two witnesses who furnished defendant's alibi for the morning of the robbery, testified that he was with them making a round of some taverns. Evidence that the defendant had sustained an injury to his right hand sometime prior to February 28, 1974, which became infected and swollen, and which caused the mid-finger of his right hand to remain in a flexed position by reason of a laceration of the extensor tendon was also offered. According to this testimony the defendant sustained this injury defending a bar-maid from an unruly customer. The thrust of this evidence was for the purpose of demonstrating that the defendant was unable to handle a gun with his right hand as the victims of the robbery had testified the robber did during the course of the incident at the Men's Store.

According to the records of the Bethesda Hospital one "Roland Johnson" was admitted to that hospital at 10:45 p. m. on March 13, 1974, for treatment of facial lacerations sustained at the Rusty Springs Tavern earlier that evening. A witness for the defense testified that she accompanied the defendant to the hospital on this admission and signed the admission papers "Carol Johnson," as next of kin, although that was not her name. This witness, as well as others, testified that these wounds to defendant's face would have still been visible when he was displayed to the victims of the robbery on March 23, 1974, in the police line-up, despite the failure of the victims to mention that they observed these wounds when they saw the defendant in the lineup.

In addition to the defendant's alibi evidence, defense counsel's theory was that it was Michael Berry who was the culprit and that the police officers had abandoned their search for the real robber once they had an identification of the defendant by the victims of the robbery.

Although the discovery process in criminal proceedings is not compelled by either federal or state constitutional requirements, the Supreme Court of this State has made it clear that the basic object of such process, insofar as a defendant is concerned, is to permit the defendant "a decent opportunity to prepare in advance of trial," and thus extend to him the *fundamental fairness* which the adversary system aims to provide. *State v. Johnson*, 524 S.W.2d 97, 101[5] (Mo. banc 1975). Prior to July 1, 1974, when the new rules for discovery in criminal cases adopted by the Supreme Court of Missouri on October 9, 1973, took effect, there was no general right to discovery in criminal cases in this State. *State v. Tressler*, 503 S.W.2d 13, 17[4] (Mo. 1973), cert. denied, 416 U.S. 973, 94 S.Ct. 2000, 40 L.Ed.2d 563; *State v. Rains*, 537 S.W.2d 219, 222 (Mo.App.1976). With the effective date of Rules 25.30–25.45 V.A. M.R. a new era in the expedition of cases in the criminal justice system of this State came into being, and defendants charged in the courts of this State have been afforded a tool to ascertain prior to trial information in the files of the prosecution withheld

from them in times past so that they can prepare their defense and better evaluate the advisability of disposition of their cases without the necessity of trial. The State too has gained in that it no longer shall be subject to surprise at trial by the alibi defense of the defendant by the adoption of Rule 25.34(A)(5) V.A.M.R. requiring that a defendant disclose to the State upon written request by the State whether he intends to rely on alibi as a defense and if so, the specific information as to the place at which he claims to have been at the time of the alleged offense and, as particularly as known, the names and addresses of the witnesses by whom he proposes to establish his alibi. Mutuality of discovery has thus been established.

By Rule 25.30 V.A.M.R. pre-trial discovery in criminal cases is limited to felony cases and is not available to persons accused of crime until the information or indictment charging the offense has been filed in the court having jurisdiction thereof. The State is required by Rule 25.32 V.A.M.R. to disclose to the defendant *without court order* upon written request made not later than twenty days after arraignment nine items of material and information within its possession or control. Rule 25.32(A)(1) V.A.M.R. requires that the State disclose upon request and without court order not only the names and last known addresses of persons whom the state intends to call as witnesses at the trial, but also their written or recorded statements and existing memoranda reporting or summarizing part or all of their oral statements. This rule constitutes a departure from the limited discovery available to defendants prior to the adoption of the new discovery rules and is in substantial compliance with Standard 2.1 of the American Bar Association's Standards Relating to Discovery and Procedure Before Trial. "These rules promulgate a procedure, within constitutional definition, for mutual pre-trial disclosure between the parties in case of felonies. Their desideratum is a quest for truth which promotes informed pleas, expedited trials, a minimum of surprise and opportunity for effective cross-examination . . . The obligation

of the State for the disclosure of a written statement of a witness under Rule 25.32 must be read within this broad purpose of full and free discovery, which includes opportunity to the defendant to prepare in advance of trial for the cross-examination and impeachment of a witness by his own statement." *State v. Buckner*, 526 S.W.2d 387, 392[2, 3] (Mo.App.1975).

These new rules of criminal discovery adopted by the Supreme Court on October 9, 1973 had been widely disseminated among the members of the Bar of this State for study and comment and had become effective on July 1, 1974, almost seven months before this case came to trial on January 27, 1975. Despite the fact this cause was filed in the Circuit Court of the City of St. Louis prior to the effective date of the rules by some two and one-half months and the request for discovery was filed by the assistant public defender representing the defendant at that time on May 3, 1974, there was no specific request for any written or recorded statements and existing memoranda reporting or summarizing part or all of any oral statements of any witnesses to be used by the State at trial. After the date on which the Rules became effective no further written request was made for any other information or material of this nature in the possession or control of the State. However, discussions were had with the prosecutor concerning "police reports" and an agreement was arrived at whereby the assistant circuit attorney was to permit the defendant's counsel to look through his file in which there was a copy of the police report of March 16, 1974. Whether in reviewing the prosecutor's file this report was inadvertently overlooked by defense counsel is not established, but the inference is strong that it was. Insofar as the police reports are concerned it is apparent that neither the assistant circuit attorney nor the defense counsel were of the opinion that they were proceeding under the Rules, unless the terminology of the written letter filed by the assistant public defender prior to trial counsel's entry of appearance in the case and the reference

therein to "certain information ordinarily available through the discovery process" can be so construed. There is no evidence in this record from which we can deduce that it was the practice of the office of the Circuit Attorney to make available to defendants copies of all police reports contained in their files with respect to a particular case without court order when this letter was filed. It would appear from the assistant circuit attorney's statement to the trial court that at the time of this occurrence it was the trial assistant handling the case or someone else in the office of the Circuit Attorney who decided which police reports would be furnished the defendant's counsel in the absence of a court order, and this decision might depend upon whether the particular police report sought accurately reflected the facts as the office of the Circuit Attorney believed them to be. The defense counsel did admit that there was some misunderstanding on the matter and that the suppression of the police report of March 16, 1974, was not due to bad faith on the part of the assistant circuit attorney, as we noted earlier in this opinion.

■ Where the question of suppression of evidence which should have been made available to a defendant in a criminal trial is concerned it is immaterial whether said failure to afford discovery is due to negligence on the part of the prosecutor or is caused by his bad faith. In *State v. Dayton*, 535 S.W.2d 469, 477[14] (Mo.App. 1976) the Kansas City District of this court said:

> "The deception from a negligent nondisclosure causes no less injury to the administration of criminal justice than a suppression made by design or guile. The duty to disclose, whether under *Brady* or Rule 25.32, rests on the prosecutor, and the material and information are within his possession or control, the cause of his failure cannot soften the sanction . . . The questions remain whether the evidence requested suppressed was favorable to the defendant and material on guilt or punishment . . . The *Brady* requirement of materiality is satis-

fied when the evidence does no more than impeach the credibility of a witness whose testimony prejudiced the defense . . . And, certainly, the purpose of Rule 25.32 includes opportunity to a defendant to prepare in advance of trial for the impeachment of a witness by his own statement . . . "

Between January 29, 1974, when this issue was presented to the trial court, and this date, there have been a number of decisions of the appellate courts of this state where the question of the effect of the failure of the prosecution to disclose to the defendant in a criminal case material and information in its possession or under its control upon request has on a conviction. (See Appendix) The thrust of all of these cases is that when in doubt it is the better practice to make available to the defendant the information or material requested lest any conviction following non-disclosure be upset on appeal. Alternatively, there is available to the prosecution in a proper case the provisions of Rule 25.40 V.A.M.R. for a protective order upon good cause shown, and Rule 25.39 V.A.M.R. setting forth those matters not subject to disclosure.

From a reading of the record presented to us we have concluded that the assistant circuit attorney in this case was less than candid with defense counsel when he was asked to look at the "missing report" and advise her if there were any differences between it and the two reports she had been furnished, particularly as it concerned the date on which Mr. DeWitte had reported that he observed the person who had committed the robbery at the DuBowl Lounge. It is not contradicted, however, that defense counsel had available to her sometime prior to trial information which if properly evaluated advised her that there was a police report of "March 15 (16)" which she did not have in her possession, and which should have led her to file a request for same. She also learned during the evidence adduced in support of her Motion to Suppress Identification that there might be a conflict in the date on which Mr. DeWitte saw the robber at the DuBowl

Lounge and at that time she made a request of the prosecutor to examine the "missing report." However, we hesitate to criticize her reliance on the reply given to her by the assistant circuit attorney that the "missing report" was essentially the same as the report of March 23, 1974, which he had furnished to her. It is a sad occurrence when members of the Bar do not afford candor to their adversaries, and most certainly is particularly unprofessional where the liberty of someone is at stake.

■ Having concluded that under the circumstances of this case the police report of March 16, 1974, should have been furnished to defense counsel prior to trial so that she could have prepared her case for trial with the material contained therein, we must now consider whether suppression of the police report was prejudicial and entitles the defendant to a reversal of his conviction and a remand of the case to the Circuit Court for a new trial.

"Whether prejudice results in a given case depends upon the nature of the charge, the evidence presented by the State, and the role the undisclosed testimony would likely have played." *State v. Dayton,,* supra, l.c. 478[15]. This is a case where the identity of the defendant as the person who perpetrated the robbery of the Men's Shop on March 9, 1974, hinges on the testimony of two of the three eyewitnesses to the occurrence and the circumstances of the incident at the DuBowl Lounge on the night of March 12, 1974, coupled with the testimony that the defendant was known by the nickname "Pete." Both of the eyewitnesses who testified at trial had ample opportunity to observe the facial characteristics of the robber in good lighting conditions over a period of 10 to 15 minutes. Mr. DeWitte's observation of the robber at the DuBowl Lounge was under less favorable lighting conditions but over a somewhat longer period of time. Identification is therefore the crucial factor in the conviction of this defendant on the charge of robbery. It was therefore essential to the defendant's case that he be advised prior to trial whether it was on the 12th or the 13th

of March, 1974, that the incident at the DuBowl Lounge took place so that he could undertake, if possible, to obtain the testimony establishing his whereabouts at that time. By suppressing this police report of March 16, 1974, the prosecutor concealed from defense counsel the reported discrepancies in Mr. DeWitte's statements with respect to the date on which he again saw the robber as well as other matters incorporated in the two police reports going to the issue of identification, thereby precluding defense counsel from any pre-trial investigation along those lines. This failure to afford discovery also resulted in the trial court's continuance of the trial for a day to permit defense counsel to undertake investigation which could have been completed prior to trial had the police report been furnished to her as she understood her agreement with the prosecutor to be. This occasioned not only a loss of the trial court's valuable time but also inconvenienced the jurors serving in the case and disrupted the flow of evidence.

Nevertheless, the sanction sought by defense counsel for the State's failure to afford discovery was mistrial. It is unnecessary for us to cite those innumerable authorities holding that a mistrial is a drastic remedy to be invoked only in those rare circumstances where there is not any other method available for curing error occurring during the course of trial. Rule 25.45 V.A. M.R. provides for those sanctions available to a trial court where, during the course of a criminal proceeding, it is brought to its attention that one of the parties to the cause has failed to comply with an applicable rule of discovery or an order issued in furtherance thereof. Which sanction to impose must, of necessity, in most instances rest with the trial court in the absence of an abuse of discretion.

Here the trial court took remedial action and directed the assistant circuit attorney to surrender forthwith to defense counsel a copy of the police report of March 16, 1974. He also continued the case to the following morning so that defendant's counsel could consult with her client and make any inves-

tigation necessary to meet these newly discovered matters which might affect the defense strategy she had adopted. Although her motion for a mistrial had been denied, the trial court advised her that he would reconsider on the morrow when she returned to the courtroom after consulting with her client and completing any investigation thereby found necessary.

The following morning when the trial resumed no suggestion was made to the trial court that she had been unable to complete her investigation of the newly discovered matters nor that there were unavailable to her at that time any witnesses whose testimony was necessary to meet these new matters. While she did renew her motion for mistrial, said motion was based upon the same grounds she had originally stated to the trial court, and the motion was denied.

Under these circumstances, and having in mind the evidence presented in support of the defendant's defense of alibi as well as the other defense testimony mentioned hereinbefore, we have concluded that any prejudice which the defendant sustained by the failure of the assistant circuit attorney to furnish his counsel with the police report of March 16, 1974, was obliterated by the action taken by the trial court in continuing the trial of the cause and affording his counsel an opportunity to consult with him and present evidence in conflict with that of the State on the incident at the DuBowl Lounge, whether it actually took place on either the 12th or 13th of March, 1974.

With respect to the defendant's contention that he was prejudiced during the evidentiary hearing on his Motion to Suppress Identification by reason of the prosecutor's non-disclosure his counsel was precluded from impeaching those witnesses whose testimony was presented at that time, we do not arrive at that same conclusion. In support of this argument the defendant again relies on the discrepancies between the two police reports and argues that "the nature of the victims' initial selection of Michael Berry had been stated in much firmer terms" in the police report of March 16,

1974, than it was in the report of March 23, 1974.

Examination of the report of March 13th reveals that report merely states that after viewing Michael Berry's photo, all of the robbery victims agreed that the photo of Mr. Berry "greatly resembled" the robber, but that the man who robbed them had no mustache or beard as did Mr. Berry in the photograph displayed to them. The March 23rd report states that a photo of Mr. Berry had been *tentatively* identified by Ms. Herrell and "DeWitte Stanton," who stated that Mr. Berry "greatly resembled the wanted subject except that the photo showed Berry with a beard and mustache." The same trial judge who heard the motion to suppress also heard this testimony and the cross-examination of the witnesses on the same matter during the course of trial. The jury also heard that portion of this evidence presented in their presence, the explanation of the witnesses concerning the alleged discrepancies in the two police reports and resolved them as well as defendant's alibi evidence against the defendant. We rule these two Points against the defendant.

■ Defendant's third Point is that the trial court erred in overruling his motion to suppress identification testimony on the grounds that the out of court identification was impermissibly suggestive and violative of his right to due process. The thrust of his argument on this point is that the photographs shown to the victims of the robbery on March 23, 1974, including one of the defendant, included no other photographs of individuals with "deep set eyes." He also argues that Michael Berry's photo should have been submitted with the defendant's at the March 23rd display and that the subsequent lineup identification of the defendant on March 23rd was influenced by the fact that the robbery victims had viewed his photograph only two hours earlier. Defendant filed no exhibits in this court from which we can ascertain the validity of his complaint in this respect, and therefore we are unable to find any support in the record which will enable us to find

that the trial court erred in its ruling. We have, however, searched the record but have found no evidence to support his claim of suggestiveness in the procedures employed by the police officers in their efforts to obtain some identification of the robber so that they might successfully carry out their duties to investigate the crime and apprehend the culprit.

 Even were we to find that the trial court erred in holding that the photographic displays and the lineup identification were tainted, which we find they were not, the presence of the independent source of identification present in this case would remove that taint and authorize the in-court identification of the defendant by the two eyewitnesses as the person who perpetrated the robbery on March 9, 1974. *State v. Wallace,* 504 S.W.2d 67, 73 (Mo.1973), cert. denied, 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 76; *State v. Davis,* 529 S.W.2d 10, 14 (Mo. App.1975). We also rule this Point against the defendant.

Defendant's fourth contention, that the "State's evidence of a prior arrest and use of a false identity by appellant violated appellant's fifth amendment right not to incriminate himself and the admission of said evidence was prejudicial error," is likewise meritless. To discern what the thrust of this Point is we had to search the Argument section of defendant's brief and learned that his complaint had reference to the testimony of a police officer, Harry Hegger, during the course of his direct examination when the prosecutor asked him if he had occasion, on March 22, 1974, to arrest or assist in the arrest of anyone presently in the courtroom and his response that he had. Officer Hegger was then asked to point out the individual or individuals he arrested on that date. Defense counsel objected "to the scope of this witness' testimony unless it goes to the material issues in this case relating to Santo's Men's Shop." The objection was sustained. A discussion followed at the Bench during which the prosecutor advised the trial court that his purpose in asking the question was that the police officer placed the defendant under arrest, advised him of his rights, ascertained his identification and the defendant initially gave him a false identity and address but later corrected both. The trial court then inquired whether defense counsel had been advised that the State intended to use this statement to the police officer and she replied that she had been but that her objection was to the fact that he had been arrested previously for another crime other than the robbery of Santo's and that "he has not taken the stand to put that into question, his past into question, and there is no evidence that he has been arrested for anything else." The trial court again sustained defendant's objection. The prosecutor then proceeded to ask Officer Hegger if he had occasion on March 22, 1974, to see any individual in the courtroom. The police officer replied that he had, and when asked to point out that person, identified the defendant as the man he had arrested on that date. When asked if he learned the individual's identity, the police officer responded that he had and the name given to him by the defendant at that time was "Robert Johnson," and that he was given an address "Somewhere on East Prairie, Missouri." It was further developed by the prosecution that after further conversations with the defendant Officer Hegger learned from him that his real name was Leonard Wendell and that he lived at 7217 Pennsylvania. All of this latter testimony came in without objection.

 We find no error. Upon timely objection any possibility of conveying to the jury that defendant was arrested on any charge other than that with which he was on trial was obviated when the objection was sustained. The use of the false identification came in without objection and also came in again in the defendant's case when he introduced evidence that he had used a similar "Roland Johnson" alias when he was admitted to the Bethesda Hospital on March 13, 1974, for treatment for the injuries he allegedly sustained at the Rusty Springs Tavern, and which defendant used to support his contention that it could not have been he who was seen at the DuBowl

Lounge on the night of March 13, 1974, as Mr. DeWitte was reported to have told the police in the police report of March 26, 1974. We rule this Point against defendant.

■ The final Point on appeal is that the State in its closing argument "presented points not substantiated by the evidence and in contradiction with the evidence in an attempt to destroy appellant's defense, and was therefore prejudicial error." We are asked to consider this Point as "plain error" under Rule 84.13(c) V.A.M.R. inasmuch as defense counsel entered no objection to this line of argument at trial. Not only was no objection made to this argument but in the motion for new trial the only allegation of error referable to this Point is that the prosecution "summarized hearsay testimony and non-existent testimony in closing arguments relating to the present physical description of Michael Berry which was prejudicial to the Defendant." In the Argument portion of defendant's brief we glean that the thrust of the argument in support of this Point is that the prosecutor's argument was a misstatement of the evidence and constituted prejudicial error because there was no testimony at trial with respect to the physical appearance of Michael Berry at trial time. But, as we have heretofore stated, this Point has not been preserved for review. What defendant really wants us to consider is the prosecutor's argument that: "The officer told you that the man at that time still wore a goatee and a mustache. And they knew the victim said the man was clean shaven or generally clean shaven, so they knew he was not the man, although his eyes did resemble the man." The actual testimony was, defendant argues, that the officer did not know whether Michael Berry still had a goatee and mustache, and for the prosecutor to argue to the jury immediately prior to the submission of the case to them for their verdict that Michael Berry still wore a goatee and mustache was an attempt to discredit all of the circumstantial evidence that it was in fact Michael Berry who was the robber.

■ Even were we to consider this alleged misstatement of the evidence by the prosecutor under the "Plain Error" Rule, Rule 84.13(c) V.A.M.R., such misstatements, if they are, rarely affect the substantial rights of a defendant so as to result in manifest injustice or miscarriage of justice and entitle defendant to the relief he seeks here. *State v. Brown,* 528 S.W.2d 503, 505[2] (Mo.App.1975). Before we will reverse a conviction on these grounds it must be plainly shown that the argument was unwarranted and clearly injurious to the defendant. *State v. Hutchinson,* 458 S.W.2d 553, 556 (Mo. banc 1970), and we do not find that to be the situation here.

The judgment is affirmed.

SIMEONE and GUNN, JJ., concur.

### APPENDIX

*State v. Stapleton,* 539 S.W.2d 655, 658 (Mo.App.1976)—failure to disclose to defendant an incriminating statement made to a State's witness by the defendant, held prejudicial to defendant; *State v. Thompson,* 539 S.W.2d 647 (Mo.App.1976)—failure to disclose oral statements of State witnesses which statements had been reported or summarized; held, under circumstances of case not to require reversal of conviction; *Nelson v. State,* 537 S.W.2d 689 (Mo.App. 1976)—failure to disclose oral statement made by movant that he didn't remember what had happened or if he had killed a man; held not to require setting aside of conviction in Rule 27.26 V.A.M.R. motion because it did not meet the test that the undisclosed evidence have a reasonable likelihood of affecting the judgment of the jury and whether the evidence is material; *State v. Harrington,* 534 S.W.2d 44 (Mo. banc, 1976)—failure of State to produce prior to trial the substance of oral statements made by the defendant to an agent of the Federal Bureau of Investigation; held the failure to furnish defendant the substance of his oral statements rendered his trial "fundamentally unfair" requiring reversal of conviction; *State v. Dayton,* supra, failure to disclose report of medical doctor who examined victim of alleged sodomy which contained statement attributed to the alleged victim

which denied "any felatio (sic) or anal penetration (with) any object at all. States that men did not strike him at all", required reversal of conviction; *State v. Buckner,* supra, *State v. Buckner* (tried prior to effective date of Rules of Criminal Discovery but by agreement Rules made applicable) failure to furnish defendant signed statement of a State's witness held to require reversal and remand for a new trial even though defense had been furnished copy of unsigned statement of same State's witness.