**STATE of Missouri, Respondent,**

v.

**Charles Jackson CARTER, Appellant.**

No. 59802.

Supreme Court of Missouri,
En Banc.

Oct. 10, 1978.
Rehearing Denied Nov. 6, 1978.

Doris Gregory Black, St. Louis, for appellant.

John D. Ashcroft, Atty. Gen., Carson W. Elliff, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Defendant, found guilty of assault with intent to kill with malice aforethought, § 559.180, RSMo 1969, and of carrying a concealed weapon, § 564.610, RSMo 1969,

was sentenced to consecutive terms of forty and five years on the respective charges.

Numerous contentions of error are presented which we shall discuss in the following order: (1) In four constitutional challenges to the composition of the jury, defendant asserts (a) that the number of blacks on the panel compared to the number in the general population of St. Louis City demonstrates impermissible racial discrimination in the jury selection process; (b) that § 494.031, RSMo Supp.1975, in derogation of defendant's constitutional rights, excludes women from jury service; (c) that § 494.-010, RSMo 1969, deprives him of the right to a representative jury by excluding persons eighteen to twenty-one years of age and (d) that § 494.010 is "vague and overbroad," in allowing the jury commissioner of St. Louis arbitrarily to exclude qualified veniremen. Defendant also claims the trial court erred in: (2) admitting in evidence a pocket knife and pistol seized following a warrantless arrest made without probable cause; (3) permitting tainted in-court identification of defendant; (4) admitting testimony concerning defendant's extra-judicial statements not delivered to defense counsel during pretrial discovery; (5) allowing the testimony of two children under the age of ten, and (6) "in not sustaining defendant's motion for new trial." We affirm.

While Virgil Little, age seven, and Rondel Little, Jr., age eight, were sitting on the front porch of their South Ninth Street home in St. Louis late in the afternoon of July 24, 1975, a man approached and asked if they would like "a soda" or "a ride." When they demurred, the man dragged Virgil two blocks to a vacant lot and stabbed him four times about the rectum with a pocket knife. Rondel, Jr., saw the stabbing and ran to his house to get his father. When Rondel, Sr., reached the corner of his block, he saw his son lying on the ground with the attacker standing over him. The father, who viewed the man only from the back, chased the assailant some distance before losing him.

Police officers talked to Virgil's brother and father at the hospital, where Virgil had been taken for treatment. The father described his son's assailant as a black man wearing dark trousers and a black shirt with a white flower pattern, about 5′8″ or 5′9″ in height. Rondel, Jr., told the officers that the man had a beard of a particular type, that he was "rather tall" and in his twenties, and that he was wearing dark trousers and a black shirt with white flowers. He also told them of a light-colored car in which the assailant and another person were seated before the assailant approached the boys.

A woman who claimed to have witnessed the incident spoke to Mr. Little while at the hospital and gave him the license number of the car in which the assailant had ridden. She refused Mr. Little's request to talk to the police. Mr. Little knew where she had once lived but did not know her name and subsequent efforts to locate her were unsuccessful. It was later in the evening before Mr. Little was able to pass this information to the officers; however, while officers were still at the hospital, a woman phoned asking for the "policemen handling the assault case." She did not give her name, but described the man as a black male in his twenties wearing a black shirt with white flowers, who had ridden in a tan car and she gave them the license number of the car.

Obtaining the street address of the party to whom the license plate was issued, Officers Holdenreid and Harris proceeded there and found a cream-colored auto, with four occupants, bearing the plate described by the informant. Defendant, who was sitting in the rear seat, matched the description the officers had obtained so they ordered him from the car and arrested him. In the ensuing search of his person they found a fully loaded .22 automatic and a pocket knife. Defendant was promptly advised of his rights under *Miranda*, and transported to police headquarters.

About 9:00 p. m., wearing a black shirt with white flowers defendant was placed in a lineup with four other men, one of whom was wearing a flowered shirt of a different color. The difference in height among

some of the participants may have been a matter of inches; however, they were described as fitting the general height and description of the defendant, including facial hair. Rondel Little, Jr., and his father viewed the lineup at the same time and though Rondel, Sr., could identify only defendant's clothes as the same as the assailant's, the boy without prompting pointed out defendant as the attacker.

According to the officers, defendant, who was again advised of his rights, asked what the charges were and when told "carrying a concealed weapon and assault," stated that "he was good for the gun charge but didn't know anything about any black boy, white boy or even a blue boy." On the other hand, defendant testified that after he had been told of the charges, he asked why he was being booked for assault and the officers answered "child molestation," to which he replied, "I didn't child molest no kid." He testified that during this time he heard another officer "sitting from a distance" mention that a white child was involved.

At the hearing on defendant's motion to suppress, Rondel, Jr., was unable to identify the defendant. However, on viewing a photograph of the lineup at the police station, he pointed to the person in the photo he had identified at the lineup. At trial the same day, he again indicated defendant in the photo as the person whom he had identified at the lineup and pointed out defendant in the court room. On cross-examination, he testified that his failure to make an identification of the defendant at the suppression hearing occurred because he had not looked at the man to whom the prosecuting attorney had pointed. During the suppression hearing, Virgil, the seven year old victim, was unable to identify defendant as his attacker except to describe the man as a black wearing a flowered shirt. Defendant offered an alibi defense to the charge of

assault but admitted he was carrying the gun illegally.

Defendant's constitutional attack on the composition of the jury first centers on its racial composition. In support of the oral motion made immediately before trial to strike the array, defense counsel noted that it contained twice as many whites as blacks. The jury eventually chosen contained only two blacks. Defense counsel without documentation or suggestion of proof asserted that the black population of St. Louis is "around 40 to 50 percent," and claimed denial of defendant's right to a jury of his peers under the sixth amendment of the federal constitution made applicable to the states by the fourteenth amendment, *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

The Court in *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975), stated:

> We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment . . . . Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial.

That blacks form an "identifiable segment . . . in the community" needs no proof. *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880). However, more than bare assertions of counsel are required to show a constitutionally impermissible exclusion of an identifiable class from a panel.[1]

█ It is clear that the accused has the burden of presenting a prima facie case of racial discrimination before the state is required to justify its jury selection procedures. *Alexander v. Louisiana,* 405 U.S.

---

1. Because the allegation of unconstitutional exclusion here is the same whether the sixth amendment right to trial by jury is invoked or whether the fourteenth amendment's guarantee of equal protection is asserted, the analysis of the equal protection cases may be applied to the question of proving that a jury is less than representative. *Cf. Carter v. Jury Commission*

*of Greene County,* 396 U.S. 320, 330, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). Since defendant is of the same class as that allegedly excluded from the jury, there is no standing problem with regard to equal protection claims. Counsel has not grounded the attack on the jury on equal protection but here the two claims overlap.

625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). A prima facie case may be shown by demonstrating the statistical improbability that the observed discrepancy between the proportions of class members called to jury duty and of the class members to the population of the jurisdiction would occur by chance, together with the opportunity for subjective choice by officials during the selection process. *Alexander v. Louisiana, supra; Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). Additionally, a prima facie case may be made on a showing of an almost-complete exclusion of the class (whatever the selection procedures), for a significant period of time. This has been described as the "rule of exclusion." *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). See also *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

■ Defendant failed in his proof. Had the court been free to take judicial notice of the proportion of blacks in the population of the City of St. Louis, defense counsel pointed out the composition of only a single jury panel and petit jury in support of the claim of discrimination.[2] Nothing was offered showing repeated exclusion of an ostensibly neutral selection procedure, nor a procedure under which a subjective evaluation of potential jurors could hide discrimination. There was no proof as to racial composition or of the method of name selection for the "wheel" for the year or other representative period, nor are we told of the selection process or racial composition of the panel by months, weeks or days from which the array presented on the day of trial was select-ed. From this absence of proof it cannot be said a prima facie case of racial discrimination appears.

■ Defendant next asserts that § 494.-031(2), RSMo Supp.1975, offers a constitutionally unacceptable automatic exemption from jury service to any woman who requests it. The data necessary to support a sex based challenge to the jury's composition was simply not presented. No evidence was offered to demonstrate the sexual composition of the wheel, panel or jury. We adhere to our ruling in *State v. Duren*, 556 S.W.2d 11 (Mo. banc 1977), *cert. granted sub nom. Duren v. Missouri*, 435 U.S. 1006, 98 S.Ct. 1875, 56 L.Ed.2d 387 (1978), and this contention is denied.

■ We reject defendant's claim that § 494.010, RSMo 1969, unconstitutionally excludes those eighteen to twenty-one years of age from jury service under the authority of *State ex rel. McNary v. Stussie*, 518 S.W.2d 630 (Mo. banc 1974).

Finally, defendant asserts as unconstitutional the qualifications for jurors prescribed by § 494.010, RSMo 1969. That section provides in part:

> Every juror, . . . shall be . . sober and intelligent, of good reputation, over twenty-one years of age and otherwise qualified.

As we understand defendant's contention, he asserts that the jury commissioner[3] of St. Louis may exclude particular jurors on the ground that they are not "sober and intelligent" or "of good reputation" in spite of the fact that others would conclude the jurors so excluded in fact satisfied these requirements. It does not appear that he asserts these requirements are facially in-

---

**2.** There is no requirement of proportional representation on a particular panel or petit jury. *Swain v. Alabama*, 380 U.S. 202, 208, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

**3.** Chapter 498, RSMo 1969, governs jury selection procedures in the City of St. Louis. Section 498.120.1, RSMo 1969, provides that § 494.010, among others, will apply to potential jurors in St. Louis. Section 498.120.3 mandates that the jury commissioner inform himself of the qualifications of residents who may be liable to be summoned for jury duty. The jury commissioner's power to strike potential jurors from the lists as unqualified is found in § 498.110.3. The board of jury supervisors is given concurrent responsibility to oversee the qualifications of potential jurors and strike unqualified persons from the lists by § 498.020. Finally, the trial court has the final responsibility to strike jurors who appear unqualified as a result of their answers to the voir dire examination. § 498.120.4.

valid or that they conceal a practice of excluding potential jurors in connection with other unconstitutional challenges, *cf. Carter v. Jury Commission of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), and again defendant has failed to offer evidence concerning application of these requirements in the selection process. We find this contention without merit.

Defendant next asserts the warrantless arrest was without probable cause as the only information then available "consisted of a license plate number and a description of the clothing worn by the alleged assailant, [and that information] had been supplied by an unidentified female informant." Relying on *United States v. Calovich*, 392 F.Supp. 52 (W.D.Mo.1975), defendant maintains that the unsubstantiated tip from an anonymous informant failed to provide probable cause for the arrest. See also *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). From this he argues that the gun and pocket knife seized by the officer should have been suppressed.

■ Defendant's reliance on *Calovich* is misplaced. The record demonstrates a factual predicate far different from that defendant describes. A complete description of the assailant and his association with a light-colored automobile came from the victim's brother and (in part) his father at the hospital. This information constituted ample probable cause for the arrest of defendant. More similar is *State v. Murray*, 445 S.W.2d 296, 298 (Mo.1969), in which the overtaking of a car at 3:00 a. m., fitting a description of white over black convertible that was proceeding away from the town where a robbery occurred just minutes before, was held to constitute probable cause. In the case at bar, tracing the license number of the car provided a lead for the police to locate the suspect; the other information provided the probable cause for his arrest once located.

■ We find no error in admitting testimony relating to the out-of-court identification by Rondel Little, Jr., at the lineup on July 24, 1975. Defendant makes much of the fact that defendant was the only man in the lineup wearing a black and white flowered shirt, arguing that as a consequence the lineup was "overly suggestive." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), teaches that reliability, rather than suggestiveness, "is the linchpin in determining the admissibility of identification testimony . . . ." The Court explicitly rejected the principle that unnecessarily suggestive identification procedures per se required the exclusion of testimony about out-of-court identification made as a result of such procedures. Instead, it reiterated the "totality of the circumstances" approach in weighing the reliability of out-of-court identifications. It enumerated at 114 the factors listed in *Neil v. Biggers*, 490 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), as controlling:

> These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

■ Rondel, Jr., had ample opportunity to view the man who stabbed his brother. The man walked to the place the boys were sitting, in the late summer afternoon, and paused to ask them questions. Rondel, Jr., testified that he saw the man's face and his clothes. Because the man engaged the boys in conversation, Rondel's attention was directed toward him. The boy's description of the criminal included his clothes, the cut of his beard, and his approximate age, demonstrating both a capacity to remember what he had seen and, when checked against the description given by the informant, the accuracy of his memory. No trace of vacillation in Rondel, Jr.'s identification at the lineup can be gleaned from the record. The time between his original encounter and viewing the assailant in the lineup was at most a few hours. Finally, whatever the significance of defendant's

clothing at the lineup, the record demonstrates that Rondel, Jr., noticed differences among the men as to their beards and general appearance, as well as to their clothing, which formed the basis of his lineup identification. We find the record concerning the lineup identification supports the action of the trial court admitting the identification testimony during trial. The out-of-court identification was reliable, and it cannot be said to have tainted the in-court identification.

Defendant next contends error in the trial court's admitting evidence of defendant's statement denying any attack on a boy, because defense counsel was not provided with a copy of that statement pursuant to Rule 25.32(A)(2). The record does not demonstrate whether a written request for discovery was filed by defendant in accordance with Rule 25.32(A), but as the State does not raise the point, we will assume arguendo it was filed. It is uncontroverted that a police report defense counsel was furnished prior to trial stated that the defendant had made no statements and that the statement in question was contained in a supplemental police report which defense counsel did not receive. Defendant first learned of the statement at the suppression hearing. She asked the officer at the hearing whether that statement had been embodied in a police report, to which the officer answered in the affirmative, but counsel took no further action to obtain it. She raised no objection to it then or at any time before trial on the ground now asserted.

The trial began in the morning of August 24, 1976, immediately following the suppression hearing. Officer Holdenreid testified to the statement during the trial over defense counsel's objections. Officer Harris was prepared to testify to the statement when the court recessed for the night on August 24. The prosecuting attorney provided a photocopy of the supplemental police report to defense counsel that evening. The trial judge heard arguments in chambers on defendant's renewed objections on the morning of the 25th. The State rested its case in chief and later that day the defense presented its evidence, including defendant's version of the statement.

Defendant now insists that the untimely disclosure of the controverted statement came too late to change the defense strategy at trial. It is implicit in this argument that the defense strategy would have been different had the statement been disclosed on time. The State counters that the oral disclosure of the statement before trial permitted the defense to reshape the trial strategy, and further that the trial strategy adopted by the defendant at trial dealing with the statement demonstrates no prejudice occurred.

■■■ Defendant's claim of error is not well taken. Rule 25.45 includes continuances among the remedies the trial court can order for improper withholding of discovery material, yet at no time did defense counsel request a continuance. See *State v. Wendell,* 547 S.W.2d 807 (Mo.App.1976). The question of remedies lies within the sound discretion of the trial court, *State v. Davis,* 556 S.W.2d 45 (Mo. banc 1977); *State v. Johnson,* 524 S.W.2d 97, 103 (Mo. banc 1975), and clearly the trial court considered suppression of the statement inappropriate. We find no abuse of discretion in that determination. While a continuance may have been warranted, the defense in mapping its strategy chose not to request such action. Further, no fundamental unfairness resulted from the State's late compliance with Rule 25.32(A)(2). *State v. Johnson, supra; State v. Davis, supra.* Defendant's trial strategy obviously included his taking the stand in support of his alibi defense; accordingly it is difficult to say that introduction of the statement per se compelled him to take the stand. In addition, defendant's testimony challenged the policemen's version of the statement and its context, presenting a sharp contradiction for the jury to resolve. His testimony was entirely consistent with the theory of his defense—that he knew nothing of the attack until the police told him about it. No prejudice appears.

■■■ Defendant for his next contention of error relies on § 491.060(2), RSMo 1969,

which establishes a rebuttable presumption that children under the age of ten are incompetent to testify. *State v. Groves,* 295 S.W.2d 169 (Mo.1956). At the time of the trial, Rondel, Jr. was nine and Virgil, eight. The trial court did not rule on their qualifications as witnesses, apparently because the matter was not raised by counsel. Whatever claim defendant may have had on this point was abandoned when defense counsel failed to object to their testimony, *State v. Hastings,* 477 S.W.2d 108 (Mo.1972), and later sought to recall the boys for further examination by the defense.

██ Finally, defendant asserts that "the trial court abused its discretion in not sustaining defendant's motion for new trial." The point fails to comply with Rule 84.04(d) and preserves nothing for review.

The judgment of the trial court is affirmed.

MORGAN, C. J., BARDGETT and FINCH, JJ., and HOUSER, Special Judge, concur.

DONNELLY, J., dissents in separate dissenting opinion filed.

SEILER, J., dissents and concurs in separate dissenting opinion of Donnelly, J.

SIMEONE, J., not participating because not a member of the Court when cause was submitted.

DONNELLY, Judge, dissenting.

In determining the admissibility of testimony relating to the out-of-court identification by Rondel Little, Jr., the majority follows the teaching of *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), that reliability, rather than suggestiveness, "is the linchpin in determining the admissibility of identification testimony . . . ." Finding this teaching unpersuasive, I must dissent.

The necessity for my dissent is well formulated by the words of Mr. Justice Marshall, writing for himself and Mr. Justice Brennan, dissenting in *Manson,*

"Today's decision can come as no surprise to those who have been watching the Court dismantle the protections against mistaken eyewitness testimony erected a decade ago in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). But it is still distressing to see the Court virtually ignore the teaching of experience embodied in those decisions and blindly uphold the conviction of a defendant who may well be innocent.

"The magnitude of the Court's error can be seen by analyzing the cases in the *Wade* trilogy and the decisions following it. The foundation of the *Wade* trilogy was the Court's recognition of the 'high incidence of miscarriage of justice' resulting from the admission of mistaken eyewitness identification evidence at criminal trials. *United States v. Wade, supra,* 388 U.S., at 228, 87 S.Ct., at 1933. Relying on numerous studies made over many years by such scholars as Professor Wigmore and Mr. Justice Frankfurter, the Court concluded that '[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.' *Ibid.* It is, of course, impossible to control one source of such errors—the faulty perceptions and unreliable memories of witnesses—except through vigorously contested trials conducted by diligent counsel and judges. The Court in the *Wade* cases acted, however, to minimize the more preventable threat posed to accurate identification by 'the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.' *Ibid.*

\* \* \* \* \* \*

". . . The crux of the *Wade* decisions, however, was the unusual threat to the truth-seeking process posed by the frequent untrustworthiness of eyewitness identification testimony. This, combined with the fact that juries unfortunately are often unduly receptive to such evidence, is the fundamental fact of judicial experience ignored by the Court today.

\* \* \* \* \* \*

" . . . The Court weighs three factors in deciding that the totality approach, which is essentially the test used in *Biggers,* should be applied. *Ante,* 432 U.S. at 111–113, 97 S.Ct. at 2251–2253. In my view, the Court wrongly evaluates the impact of these factors.

"First, the Court acknowledges that one of the factors, deterrence of police use of unnecessarily suggestive identification procedures, favors the *per se* rule. Indeed, it does so heavily, for such a rule would make it unquestionably clear to the police they must never use a suggestive procedure when a fairer alternative is available. I have no doubt that conduct would quickly conform to the rule.

"Second, the Court gives passing consideration to the dangers of eyewitness identification recognized in the *Wade* trilogy. It concludes, however, that the grave risk of error does not justify adoption of the *per se* approach because that would too often result in exclusion of relevant evidence. In my view, this conclusion totally ignores the lessons of *Wade.* The dangers of mistaken identification are, as *Stovall* held, simply too great to permit unnecessarily suggestive identifications. Neither *Biggers* nor the Court's opinion today points to any contrary empirical evidence. Studies since *Wade* have only reinforced the validity of its assessment of the dangers of identification testimony. While the Court is 'content to rely on the good sense and judgment of American juries,' *ante* at 116, 97 S.Ct. at 2254, the impetus for *Stovall* and *Wade* was repeated miscarriages of justice resulting from juries' willingness to credit inaccurate eyewitness testimony.

"Finally, the Court errs in its assessment of the relative impact of the two approaches on the administration of justice. The Court relies most heavily on this factor, finding that 'reversal is a Draconian sanction' in cases where the identification is reliable despite an unnecessarily suggestive procedure used to obtain it. Relying on little more than a strong distaste for 'inflexible rules of exclusion,' the Court rejects the *per se* test. *Ante,* at 113, 97 S.Ct.

at 2252. In so doing, the Court disregards two significant distinctions between the *per se* rule advocated in this case and the exclusionary remedies for certain other constitutional violations.

"First, the *per se* rule here is not 'inflexible.' Where evidence is suppressed, for example, as the fruit of an unlawful search, it may well be forever lost to the prosecution. Identification evidence, however, can by its very nature be readily and effectively reproduced. The in-court identification, permitted under *Wade* and *Simmons* if it has a source independent of an uncounseled or suggestive procedure, is one example. Similarly, when a prosecuting attorney learns that there has been a suggestive confrontation, he can easily arrange another lineup conducted under scrupulously fair conditions. Since the same factors are evaluated in applying both the Court's totality test and the *Wade-Simmons* independent–source inquiry, any identification which is 'reliable' under the Court's test will support admission of evidence concerning such a fairly conducted lineup. The evidence of an additional, properly conducted confrontation will be more persuasive to a jury, thereby increasing the chance of a justified conviction where a reliable identification was tainted by a suggestive confrontation. At the same time, however, the effect of an unnecessarily suggestive identification—which has no value whatsoever in the law enforcement process—will be completely eliminated.

"Second, other exclusionary rules have been criticized for preventing jury consideration of relevant and usually reliable evidence in order to serve interests unrelated to guilt or innocence, such as discouraging illegal searches or denial of counsel. Suggestively obtained eyewitness testimony is excluded, in contrast, precisely because of its unreliability and concomitant irrelevance. Its exclusion both protects the integrity of the truth-seeking function of the trial and discourages police use of needlessly inaccurate and ineffective investigatory methods.

"Indeed, impermissibly suggestive identifications are not merely worthless law enforcement tools. They pose a grave threat to society at large in a more direct way than most governmental disobedience of the law, see *Olmstead v. United States,* 277 U.S. 438, 471, 485, 48 S.Ct. 564, 570, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). For if the police and the public erroneously conclude, on the basis of an unnecessarily suggestive confrontation, that the right man has been caught and convicted, the real outlaw must still remain at large. Law enforcement has failed in its primary function and has left society unprotected from the depredations of an active criminal.

"For these reasons, I conclude that adoption of the *per se* rule would enhance, rather than detract from, the effective administration of justice. In my view, the Court's totality test will allow seriously unreliable and misleading evidence to be put before juries. Equally important, it will allow dangerous criminals to remain on the streets while citizens assume that police action has given them protection. According to my calculus, all three of the factors upon which the Court relies point to acceptance of the *per se* approach.

"Even more disturbing than the Court's reliance on the totality test, however, is the analysis it uses, which suggests a reinterpretation of the concept of due process of law in criminal cases. The decision suggests that due process violations in identification procedures may not be measured by whether the government employed procedures violating standards of fundamental fairness. By relying on the probable accuracy of a challenged identification, instead of the necessity for its use, the Court seems to be ascertaining whether the defendant was probably guilty. Until today, I had thought that 'Equal justice under law' meant that the existence of constitutional violations did not depend on the race, sex, religion, nationality or likely guilt of the accused. The Due Process Clause requires adherence to the same high standard of fundamental fairness in dealing with every criminal defendant, whatever his personal characteristics and irrespective of the

strength of the State's case against him. Strong evidence that the defendant is guilty should be relevant only to the determination whether an error of constitutional magnitude was nevertheless harmless beyond a reasonable doubt. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). By importing the question of guilt into the initial determination of whether there was a constitutional violation, the apparent effect of the Court's decision is to undermine the protection afforded by the Due Process Clause. 'It is therefore important to note that the state courts remain free, in interpreting state constitutions, to guard against the evil clearly identified by this case.' *Oregon v. Mathiason,* 429 U.S. 492, 499, 97 S.Ct. 711, 716, 50 L.Ed.2d 714 (1977) (Marshall, J., dissenting.)"

The teachings of *Neil v. Biggers* and *Manson v. Brathwaite* have been widely criticized by commentators, *see e. g.,* N. Sobel, *Eye-Witness Identification: Legal and Practical Problems,* §§ 37, 38 (Supp. 1977); Grano, *Kirby, Biggers and Ash: Do Any Constitutional Safeguards Remain Against Convicting The Innocent?* 72 Mich. L.Rev. 717 (1974); Pulaski, *Neil v. Biggers: The Supreme Court Dismantles the Wade Trilogy's Due Process Protection,* 26 Stan.L. Rev. 1097 (1974); *Recent Developments, Identification: Unnecessary Suggestiveness May Not Violate Due Process,* 73 Colum.L. Rev. 1168 (1973); *Note: Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification,* 29 Stan.L.Rev. 969 (1977).

Citizens of the State of Missouri have in their constitution a guarantee that they will not be deprived of life, liberty or property without due process of law. Mo.Const. Art. I, § 10. This Court remains free to interpret the due process afforded Missouri citizens by this guarantee so as to protect against the well-documented dangers of mistaken eyewitness identification caused by unnecessarily suggestive identification procedures. I would, therefore, recognize that the due process clause of the Missouri Constitution prohibits the admission of tes-

timony as to identifications made by *unnecessarily suggestive* procedures.

To apply this requirement to the facts of this case it is necessary to look no further than the opinion in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1966). One of the procedures specifically identified as unduly suggestive is a lineup procedure in which only the suspect is required to wear distinctive clothing like that which the criminal allegedly wore, *id.* at 233, 87 S.Ct. 1926. In the instant case, at the lineup where he was identified by Rondel Little, Jr., only the defendant was required to wear a shirt of the distinctive pattern which figured so prominently in the description of the criminal given police by Rondel Little, Jr. and others. No reason or justification is given to indicate this procedure was necessary. The suspect could easily have been given a shirt which did not obviously stick out like the proverbial sore thumb.

I would reverse and remand for a new trial.