**STATE of Missouri, Plaintiff-Respondent,**

v.

**Louis V. MONTJOY, Defendant-Appellant.**

No. 10844.

Missouri Court of Appeals, Southern District, Division Three.

Sept. 10, 1979.

Motion for Rehearing or Transfer Denied Sept. 24, 1979.

Stephen L. Taylor, Sikeston, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

A jury has found Louis Montjoy guilty of robbery in the first degree, as defined and denounced by § 560.120, RSMo 1969, V.A.M.S., now repealed. His punishment has been assessed at imprisonment for a term of 10 years. He appeals.

The State made proof of the constitutive elements of the crime by one Delores Cook, manager of the E–Z Food Mart (the store) in Sikeston, Missouri. Just before the robbery was committed, Mrs. Cook had made a purchase and had counted the money in her purse. There was "approximately" $129 in her wallet, which was in her purse.

Shortly thereafter, three young men entered the store. All wore hats and stocking masks; one was armed.[1] Two of the men were shorter than Mrs. Cook; the other was "about the same height" as she. The robbers "motioned" Mrs. Cook behind one of the sales counters, and asked her to open the [cash] drawer. Being told that the cash drawer was already open, the armed man "touched" Mrs. Cook with his weapon and asked her to "raise the [cash] drawer." Some argument between Mrs. Cook and the

---

1. It is not clear from the record whether the weapon was a length of metal pipe or a short sawed-off shotgun. The handle was wrapped with electrical tape, and Mrs. Cook thought it was "a gun." It is wholly immaterial in this case whether the weapon was a shotgun or a length of pipe. See: *State v. Treadway*, 558 S.W.2d 646, 652[13] (Mo. banc 1977), cert. denied 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978).

robbers followed, one of the men "drew back to hit [her]," asserting "he didn't want to hurt [Mrs. Cook]," and the robbers decided to put Mrs. Cook and another employee in a walk-in cooler at the rear of the store while they looked for something worth taking. One of the men opened the cooler so Mrs. Cook and her companion could enter. The cooler had glass doors, and Mrs. Cook "could see the front of the store from the inside." Presently the men left. Mrs. Cook and her companion "came out of the cooler, walked up front and called the police . . . ." Mrs. Cook looked for her purse and found it lying on the floor behind the counter where she had left it. Her wallet was gone. Mrs. Cook was asked on cross-examination if she was "in fear when these [men] came in." Her reply was that she had tried to be brave, but had indeed been put in fear, and was "afraid it showed."

The defendant's criminal agency was established by physical evidence and by the testimony of an abettor. A handprint was lifted from the metal latch by which the cooler door was opened. This print was compared with defendant's handprint and "somewhere in excess of twenty" points of similarity were found. The expert who compared the handprints was unable to say how long the defendant's handprint had been on the handle of the cooler, but the evidence was such that the jury could have inferred that it was fresh and undisturbed when it was lifted.

The abettor, one Curtis Dale Ivy, testified that he, the defendant and three other young men drove to the E–Z Food Mart during the early evening of August 27, 1976. Ivy, the defendant and another young man "had [stocking masks] on," "was [sic] carrying a gun" and "got the money and left out." Ivy described the weapon as "a shotgun," but was unable to recall which of the participants had carried it. After the money was taken, according to Ivy, "we put the ladies in the freezer and left out." The defendant's defense—to which he testified—was alibi. The jury chose to disbelieve the defendant and his witnesses.

The defendant's first point is that he was denied a trial by a jury selected from a fair cross section of the community, as guaranteed by the Sixth Amendment. There is no doubt that such right inheres in the Sixth Amendment, *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), nor is there any question that the "fair cross section" requirement is applicable to the states, *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), but defendant mistakes the nature of the right he claims was violated. The fair cross section requirement is not directed to the composition of a particular array or poll, *Swain v. Alabama,* 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759, 766 (1965); it is directed to the method of selecting potential jurors from the members of the community. *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 668 and n. 20, 58 L.Ed.2d 579, 586–587 and n. 20 (1979). In *Duren,* the court held that a criminal defendant claiming violation of the fair cross section principle has the burden to prove: (1) that the group allegedly excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren, supra,* 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 586–587. The difficulty with defendant's argument is that the record before us reflects no effort to establish systematic exclusion of any "distinctive" group in the jury-selection process.

We grant it is fairly inferable that the defendant is a black man; his challenge to the array was timely and no proof is required to establish that blacks are a "distinctive" segment of the community. *State v. Carter,* 572 S.W.2d 430, 433 (Mo.banc 1978). There were, however, a number of black citizens on the panel from which the poll was selected, and apart from senior counsel's bare assertions, the record itself does not show how many blacks were summoned *for jury duty nor lend any support*

to the suggestion that the black members of the array were mere token talesmen. Senior counsel declined a timely and reasonable offer to make proof of systematic exclusion of blacks from the venires summoned in Scott County, electing instead to point only to the racial composition of a single venire and petit jury.

On appeal, counsel has sought to improve the record by asking us to take notice of census data showing that 8 percent of the population of Scott County is black. While we agree we may notice census data, *Moulder v. Webb,* 527 S.W.2d 417, 419[4] (Mo.App.1975), such data scarcely amounts to proof that blacks are systematically excluded from the venires summoned in Scott County. Defendant's failure to prove such systematic exclusion is fatal to his claim that his Sixth Amendment rights were infringed. *State v. Mooring,* 445 S.W.2d 303, 305 (Mo.1969); *Wallace v. State,* 556 S.W.2d 471, 472[3] (Mo.App.1977).

█ A further assertion of error is that the court erred in permitting Curtis Ivy, defendant's abettor, and one Joe Lee Hatchett, to testify because their testimony was given "under duress and threats made by the State and in abrogation" of their privilege against self-incrimination. This claim of error is not supported by the record, but if it were, such error would furnish no basis for complaint by the defendant. *State v. Phillips,* 511 S.W.2d 841, 845[11, 12] (Mo.1974), and see *United States v. Howell,* 470 F.2d 1064, 1067 (9th Cir. 1972).

The other two assignments of error are so wholly devoid of any merit that they require no discussion. We find no prejudicial error in any respect briefed or argued here, and accordingly the judgment is affirmed.

All concur.