**STATE of Missouri, Respondent,**

v.

**Leon Vincent TAYLOR, Appellant.**

**No. WD 33871.**

Missouri Court of Appeals,
Western District.

Sept. 27, 1983.

As Modified Oct. 4, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 29, 1983.

Application to Transfer Denied Jan. 17, 1984.

not sanction the illegal obstructive conduct in issue.

J. Armin Rust, Lexington, for appellant.

John Ashcroft, Atty. Gen., Joseph Colagiovanni, Asst. Atty. Gen., Jefferson City, for respondent.

Before DIXON, P.J., and KENNEDY and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

Appellant Leon V. Taylor was jury convicted of attempted first-degree robbery in violation of Section 564.011, RSMo.1978,[1] and sentenced to five year imprisonment.

At approximately 7:30 in the evening of November 21, 1981 Mrs. Edith Crumley, age 69, was walking on the north side of Main Street in Lexington, Missouri, toward her home. Mrs. Crumley observed a black man come from around the corner and run toward her. The man grabbed Mrs. Crumley by the shoulders and shook her while demanding her money. When the victim did not respond to his request for her money he struck her over her left eye with a pistol. The blow caused a bad cut which required several stitches in a hospital emergency room, resulting in a blood clot which remained for several weeks. The blow knocked her glasses off.

---

[1] All statutory references are to RSMo.1978, unless otherwise indicated.

The attempted robbery, which possibly lasted as long as three minutes, (during which time the victim and assailant were face to face for one full minute and less than six inches apart) was thwarted when three young men arrived at the crime scene. Two of the youths, Donald Rector and Brad Stephenson jumped from the car in which they were riding and set off chasing the attacker down the street, while the third youth, David Cross, the driver, stayed to help Mrs. Crumley to the car. The attempt to apprehend the perpetrator was cut short after about a block and one-half foot chase when the offender turned and yelled at the boys to stop and fired a shot from his pistol at them.

Taylor was subsequently arrested in connection with this crime. Taylor matched the description given by Crumley of her attacker. On December 1, 1981, ten days after the attack, a line-up was held by the Lafayette County Sheriff, in which Mrs. Crumley, Rector, Stephenson and Cross all positively identified appellant as the individual who had attempted to rob Mrs. Crumley. The victim and the same three witnesses reiterated their identification of Taylor at the preliminary hearing on December 15, 1981, the hearing to suppress the identifications, and at trial. At no time during any of the proceedings did Crumley or the three boys express any doubt as to their identification of Taylor as the assailant.

Appellant raises one point of error on appeal. He contends the trial court committed plain error resulting in manifest injustice, in denying his motion to suppress pre-trial or in-court identification testimony and in then allowing Edith Crumley and Rector to identify him at trial as the perpetrator of the crime. *See* Rule 29.12(b). Appellant claims error due to the fact that procedures utilized by the Lafayette County Sheriff's Department and Lexington Police Department caused the line-up to be so impermissibly suggestive as to give rise to the substantial likelihood of irreparable misidentification of him and the in-court identification of him as the assailant by

Rector and Crumley was inevitably tainted by the improper nature of the line-up.

Appellant's point of error is ruled against him and the judgment of the trial court is affirmed.

 In order for appellant to succeed here, he must demonstrate two distinct factors. First, he must show that the line-up procedure was unduly suggestive as administered by the police. Second, he must demonstrate that the line-up was so impermissibly suggestive as to create a very substantial likelihood of an irreparable misidentification at trial. This second factor reflects the principle that unnecessarily suggestive line-up procedures do not *per se* require the exclusion of identification testimony elicited from witnesses who have been present at such line-ups. The rule is that even if the line-up is improperly suggestive, reliable identification testimony derived from observations unconnected to the line-up will be permitted before the jury at trial. *State v. Carter,* 572 S.W.2d 430, 435 (Mo. banc 1978). *See also Manson v. Brathwaite,* 432 U.S. 98, 113, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 198–200, 93 S.Ct. 375, 381–383, 34 L.Ed.2d 401 (1972). This two-step analysis was recently set forth in *State v. Higgins,* 592 S.W.2d 151, 159 (Mo. banc 1979); and *State v. Sanders,* 621 S.W.2d 386, 389 (Mo.App.1981).

### I.

As to whether the line-up was suggestive, the appellant basically contends the viewers knew the people in the line-up (other than Taylor), or, the physical characteristics of those in the line-up made the selection of Taylor inevitable. A review of the scenario of events following Taylor's arrest relating to the identification by the victim and witnesses seems in order.

The line-up held December 1, 1981 and the identifications of Taylor, who is black, was sought to be suppressed and a hearing was held on February 24, 1982. At the hearing Sheriff Darnell, who conducted the line-up, testified as to the difficulty in obtaining black persons to be in line-ups in Lafayette County. He said one of the four

persons in the line-up, # 2, was in jail, # 3 was a city worker who was putting up decorations at the time asked, and # 4 was a fellow "from uptown" Lexington. The young men, as a group, viewed the line-up first, then the victim viewed the line-up alone. Darnell testified the victim said # 1 looked exactly like the man who robbed her—"Looked just like him". Mrs. Crumley described the incident where her assailant grabbed her, shook her, hit her when she didn't give him the money, how her glasses were knocked off, and that she had no trouble seeing the attacker's facial features. She had not seen the other three men in the line-up before. She testified to pointing out Taylor immediately when she stepped through the door to view the line-up, after noting his appearance and even the way he stood. Rector knew # 2 and # 4 in the line-up. He did not know # 3 (who had an afro hair style). He said Taylor, # 1 looked exactly like the one who did it (Rector had seen the assailant for 20 seconds). Stephenson who saw the assailant for 10 seconds at about 10 feet away identified Taylor as the man he and Rector ran off. He knew # 2 and # 4 and that # 2 was in jail at the time. Cross also knew # 2 and # 4 by name but did not know # 3 (the same as Stephenson). Cross identified # 1, Taylor, as the attacker.

At the December 15th Preliminary Hearing, Crumley described her attacker and the pistol he hit her with. Her identification matched that of Taylor. The sheriff escorted her into the room to view the line-up. The boys did not view the line-up with her but were opposite from her across the room while she viewed the array. She said that at the line-up she almost immediately picked out Taylor as her attacker, and repeated she knew none of the other three in the line-up. Rector identified Taylor and described his clothing the night of the crime. Stephenson identified Taylor at the Preliminary as did Cross who reiterated the boys saw the line-up first, stayed in the room while Crumley was brought in, but stated Crumley said nothing to them while she viewed the line-up.

The trial testimony of the three young men and Crumley was consistent with their previous account, the events of the attack and the line-up. Crumley made an in-court identification of the defendant ("I have no doubts whatever, none"). She said there was no conversation at the line-up between her and the boys and she did not know whether they had identified anybody or not. Rector made a positive in-court identification of the appellant ("this is the man I saw"). The appellant put # 4 on the stand who said he made eye contact with the boys and smiled at them during the line-up, before the victim came in. # 4, who testified for Taylor said he did not know any of the boys who viewed the line-up. Stephenson and Cross were also called as witnesses for the defendant. Stephenson's testimony was the same as at prior hearings. He said he knew # 2 and # 4, had seen # 3 before but did not know his name, and that he had no trouble picking appellant out of the line-up. Cross was consistent with his former testimony and with that of Stephenson. As to the line-up, he stated the boys, although in the same room when they viewed the line-up, were asked separately their answers and he did not know if the others had made an identification. He identified the appellant as the assailant.

There is no evidence that the law enforcement officials prior to the line-up knew that any of the persons in the line-up were personally known to the victim. *U.S. v. Hadley,* 671 F.2d 1112, 1115, footnote 2 (8th Cir.1982). The victim knew none of the persons in the line-up, so her identification could not have been tainted for that reason. That Rector knew # 2 and # 4, (a witness for the state) and then talked to Stephenson and Cross and somehow they all just picked Taylor because he was the only one left, is unsupported by the evidence, particularly Cross's testimony that they did not discuss with each other who, if anybody, they had picked. There was no hint the boys had talked to or influenced Mrs. Crumley at the line-up or anytime later in her identification.

Whether the trial court identification of Rector was as a result of knowing members

of the array need not be decided because of the determination made under part II pertaining to the reliability of the identifications. Likewise, it is not necessary for a protracted discussion of the effect of the in-court identifications made by Stephenson and Cross who were called by appellant and identified him as the perpetrator. The quandry of later finding out that persons in the line-up were known to the viewers and the result on any reliable identification to be made thereafter is evidenced by the answer given on cross-examination by Sheriff Darnell at the Suppression Hearing, "How do I know who they know?" Needless to say, law enforcement personnel should be as careful as possible to avoid situations like the case at bar, for the taint of suggestiveness grows as the line-up tends to become a showup. *Cf. State v. Green,* 635 S.W.2d 42, 45 (Mo.App.1982).

■ As to the other prong of appellant's point, that the physical characteristics of the people in the line-up made his selection a certainty, is without merit. A picture of the four people in the line-up, introduced in evidence belies his point. # 2 is definitely shorter than the rest, but appellant, # 1, and the man who is # 3 are so close in appearance (other than hair, # 3 has an afro, but all the witnesses said the assailant was wearing a stocking cap) that it is hard to tell them apart. "A line-up does not require exact conformity, the disparity in a feature of two among standees does not invalidate the array as impermissibly suggestive." *State v. Hayes,* 624 S.W.2d 488, 489 (Mo.App.1981). The appellant did not produce sufficient evidence to show such a disparity in the persons in the line-up to direct any of the witnesses attention to him. As was noted in *State v. Green,* true look alikes are not required. Only # 2 was substantially shorter than the rest. Police stations are not theatrical casting agencies. *State v. Green, supra,* at 45; *U.S. v. Lewis,* 547 F.2d 1030, 1035 (8th Cir.1976). Appellant's complaint that none of the standees looked like him, making the line-up suggestive is contradicted by his later complaint that # 3 resembled him except for his hair

style as also being suggestive, just will not stand. He can't have things both ways.

## II.

■ Assuming *arguendo* the line-up was impermissibly suggestive, there was no want of due process in allowing the victim and Rector to testify as to the identification of Taylor. *State v. Littleton,* 649 S.W.2d 225 at 227 (Mo. banc 1983).

■ In the instant case, each in-court witnesses' identification was based on a reliable and independent factual basis which would serve to remove any unconstitutional taint that might have attached by reason of a suggestive line-up. *State v. Gant,* 586 S.W.2d 755, 765 (Mo.App.1979); *State v. Carter, supra,* at 435–36; *State v. Simmons, supra,* at 561, infra. It is reliability, not suggestiveness, that is the linchpin in determining due process consideration of rulings on in-court identification testimony. "Reliability" is to be assessed under the totality of the circumstances. *Neil v. Biggers, supra; and Manson v. Brathwaite, supra.* See also *State v. Higgins, supra,* at 160. The factors to be considered in determining whether identification testimony is sufficiently reliable that admittance at trial will not violate defendant's right to due process include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witnesses degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation. *Neil v. Biggers, supra,* 409 U.S. at 199, 93 S.Ct. at 382; *Manson v. Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253; *State v. Higgins, supra,* at 160; *State v. Littleton, supra,* at p. 227.

Upon a review of these various factors in light of the testimony of Donald Rector and Edith Crumley, it is clear that their identification met the criteria of reliability, and was admissible. In the present case both witnesses agreed that the area in which the robbery occurred was sufficiently well lighted to allow for an accurate observation of the appellant's facial features. *State v. Littleton, supra,* at 227; *State v. Simmons,*

559 S.W.2d 557, 561 (Mo.App.1977). *Compare, Adail v. Wyrick,* 711 F.2d 99 at 101, 102 (8th Cir.1981). Mrs. Crumley consistently stated that the incident lasted up to three minutes and that she observed appellant as he ran toward her and then again face to face for more than one minute at a distance of less than six inches. Mrs. Crumley had ample opportunity to view her assailant at the scene of the crime, constituting a reliable and independent observation from the line-up viewing. Donald Rector also testified that he clearly saw the appellant's face for at least fifteen seconds as he alighted from the car to aid Mrs. Crumley. *See, State v. Higgins, supra,* at 160, where witnesses were 20 to 25 feet away and viewed for 5 to 10 seconds. Thus, both witnesses meet the first part of the analysis. *State v. Charles,* 612 S.W.2d 778, 780 (Mo. banc 1981).

As to the degree of attention, each witnesses' complete attention was riveted on the crime as it transpired. Rector was so involved that he attempted to apprehend the assailant at risk to his own life and safety. Mrs. Crumley's attention was unavoidably focused on the features of her assailant as she was in immediate contact with her attacker.

Both Rector and Mrs. Crumley gave prior accurate descriptions of the assailant. Rector has given a statement describing the offender as "a black man, early 20's, 160 to 168 pounds, about 5′8″ to 5′10″, and Mrs. Crumley described the offender as "approximately 5′8″ to 5′10″ tall, and weighed approximately 160 pounds to 168 pounds". The appellant is a black male, 5′8″ tall and 154 pounds. Thus, there is little doubt that the accuracy of these prior descriptions is sufficient to support the reliability and independence of the in-court identification testimony. *State v. Carter, supra,* at 778; *State v. Simmons, supra,* at 561.

As to the witnesses' level of certainty, both Rector and Mrs. Crumley stated that they were certain that this was the man who had committed the crime, and that they recognized him from both the crime scene and the line-up. This identification was at the line-up, preliminary hearing, suppression hearing and at trial.

The line-up was held only ten days after the commission of the attempted robbery, a short enough time to have no appreciable effect upon the reliability and independence of the on-scene observations of the two witnesses. Thus, the in-court testimony of Mrs. Crumley and Donald Rector is which they identified Taylor as the assailant, and their prior identifications of Taylor at both the suppression hearing and the preliminary hearings are sufficiently reliable to permit its admission. No trace of vacillation as to the identification of Taylor by the victim or Rector is shown from the record of the suppression hearing. *State v. Carter, supra,* at 435. The trial court did not err in allowing the identification testimony of the witnesses before the jury. *See State v. Davis,* 529 S.W.2d 10, 14 (Mo.App.1975) (Noted time between crime and line-up 7 months in *Neil,* and 2 year in that case "not factual").

The remainder of the appellant's argument is based on matters which go to the weight of the evidence and general credibility of the witnesses rather than the admissibility of their testimony. Prior inconsistent statements by Mrs. Crumley, the certainty of the language of both Crumley and Rector in identifying the appellant, are all facts to be weighed by the jury in their deliberations. *State v. Higgins, supra,* at 160; *State v. Davis, supra,* at 14–15; *State v. Carter, supra,* at 782.

■ The evidence shows and appellant admits in his brief the statement to the witnesses of fact that appellant had only been recently released from incarceration for second degree murder came after they had each made identification of him. Alleged statements to the victim and the boys about Taylor having taken a lie detector test also came after positive identification of him as Crumley's attacker. Also noted is appellant's assertion of the police suggesting to the witnesses that they had a suspect when the line-up was arranged. There was no evidence the sheriff or the police said they had the person who did it or

that # 1 was that person. The very conducting "of any sort of identification process is suggestive to the witness being requested to make an identification. Any rational person requested to view either a group of photographs or a line-up knows that there is *some* belief that the persons sought might be included in the group reviewed." *State v. Sanders, supra,* at 388. There was no sufficient evidence of suggestiveness in the totality of the procedures to cause a substantial risk of misidentification in this case.

In view of the totality of the circumstances there was not unnecessary suggestion to the witnesses capable of creating a substantial risk of their making an irreparable misidentification. The trial testimony of both Edith Crumley and Donald Rector was founded on independent observations made at the scene of the crime. The admission of their testimony did not violate Taylor's right to due process nor did its admission result in a manifest injustice or a miscarriage of justice.

■ This case was argued on March 4, 1983. During this argument the state discussed certain issues, such as whether appellant had preserved the error complained of, and followed up a week later with a four page letter containing some six points with 20 cases cited as authority. Many of the points were not mentioned in the respondent's brief and only one of the cases had been used in its brief (it was also relied upon by the appellant). Appellant has filed a motion to strike this "letter brief". Although the court appreciates the well-researched "letter brief", it simply is not fair to any appellant to have to respond to theories and arguments not briefed by the respondent. Not only is it too late at oral argument for the appellant to prepare for or respond to new arguments or variations on previous themes, such a practice creates a different problem. If the respondent can, before handdown of opinion bring up new matters, then, the appellant should be able to respond. This process would set up the possibility of a never ending flurry of briefs so that matters originally briefed during the regular briefing schedule would become obliterated in a continuous "point and counter-point". None of the matters in the "letter brief" are necessary to deciding the issue in this case. It is out of time and appellant's motion is sustained. This ruling does not prohibit the true supplementation of points already raised with new or recent cases.

The judgment of the trial court is affirmed.

DIXON, Judge, dissenting.

I dissent. This is not a plain error case as to the admission of Rector's and Crumley's identifications. The defendant raised the issue in his motion for new trial. In that motion the defendant asserted the trial court erred in not sustaining the motion to suppress as to witnesses Rector and Crumley and squarely presented in the following language the issue of improper identification procedures.

[B]ecause the extrajudicial lineup held on December 1, 1981, which resulted in the identification of Defendant, was so impermissibly suggestive as to give rise to the very substantial likelihood of irreparable misidentification of the Defendant as being the person who perpetrated the crime against Edith Crumley. Further, said impermissibly suggestive lineup proceedure [sic] employed by the members of the Lafayette County Sheriff's Office and the Lexington Missouri Police Department, violated Defendant's right to due process quaranteed [sic] by the Fourteenth Amendment of the Constitution of the United States and by Article I, Section 10 of the Missouri Constitution.

The state insists that defendant waived the error by failing to object to Rector's testimony and renewing the motion when he testified. The defendant's counsel did not object when the witness first testified. Defense counsel in a colloquy with the court asked the court to recognize the continuation of his objection based on the motion. The court by its responses indicated that the grounds for the objection were understood and that the matter was preserved.

The state argues in the brief that the objection was waived by failure to object. The state cites cases not precisely in point but referring to the contemporaneous objection rule. The seminal case discussing that rule is *State v. Yowell*, 513 S.W.2d 397 (Mo. banc 1974).

In *Yowell*, the court reaffirmed the necessity for a contemporaneous objection to preserve error in overruling a motion to suppress evidence. The court set forth the rationale for the rule as follows:

It has been suggested that none of the cases have stated any reason for the requirement that an objection be made to the introduction of the evidence at trial. The defendant's brief was written before our recent decision in *State v. Bryson*, supra [506 S.W.2d 358 (Mo.1974)]. Therein it is stated that 'This case demonstrates the soundness of the rule enunciated in *State v. Simone, supra* [416 S.W.2d 96 (Mo.1967)]. Here the motion to suppress was heard and decided by a circuit judge who did not preside over the trial. The judge presiding over the trial would not necessarily know what transpired at the hearing on the motion to suppress nor would he know with any degree of particularity what items of evidence were the subject of the motion. The hearing of pretrial motions by a judge who does not preside at the trial itself occurs frequently in multiple-judge circuits and also occurs when a motion for change of judge is filed and granted in other circuits after the motion to suppress has been heard and decided. Additionally, trial strategy can account for not objecting to some items of evidence at the trial. In any event, the judge presiding at the trial must at least be informed of a party's objection to evidence at trial before an alleged error stemming from the admission of the same can be considered on appeal. To hold otherwise would be to allow a party to sit idly by while evidence was admitted, take his chances with a jury, and then if he loses to bring up a matter for the first time on appeal that had never been presented to the trial judge. This is sim-

ply not conducive to an orderly system of justice and is not acceptable.' 506 S.W.2d 361. In addition to what was said in Bryson we suggest that it is entirely possible that after hearing the evidence on motion to suppress the defendant's attorney may become convinced that his motion was without merit. The required objection will therefore serve to advise the court as to whether the defendant continues to consider the evidence inadmissible. Also, even if the judge that heard the motion is presiding at the trial, upon objection to the evidence he may desire to reconsider his prior ruling. We think the foregoing demonstrates sound reasons for the requirement.

513 S.W.2d at 402–03.

None of the reasons for the rule have any application in this case. Counsel and the court were aware of the defendant's claim. No different judge was involved. There was no issue of trial strategy at the time the evidence came in. In such circumstances the rule should not be applied to defeat a legitimate claim of error.

As to the complaining witness, the record shows a clear and timely objection to her identification testimony and as to that testimony there can be no doubt that the claim of error is preserved.

The testimony challenged is of the only two witnesses who testified, the victim and Rector. The inquiry focuses first on Rector. This young man was an eyewitness to the crime. He and his companions were driving along and saw the victim struggling with her assailant. The car was stopped. Rector and one of his two companions pursued the assailant. The assailant fired his gun and the pursuit understandably ceased. The pursuit and the shot occurred in a space of no more than twenty seconds. Rector said that the area where the offense occurred was lighted but that the pursuit was in a dark area. Rector said his closest view was 15 yards. There is nothing to indicate the distances involved except that the chase was for about 15 yards. The description given by Rector was of a black man in the early 20's weighing 160–168 pounds with a green hunting jacket without sleeves and

wearing a stocking cap. The witness was unable to give a facial description at the time of the offense. The offense occurred November 21st at 7:45 p.m. On December 1st a lineup was held at the jail in Lafayette County. Rector knew two of the four persons in the lineup. The third individual had a heavy head of hair—an "Afro"—and, according to the witness Rector, could therefore not be the assailant. Rector knew a suspect was in custody and he selected the fourth person, the only one not either known by him or eliminated by a distinguishing characteristic. Before the preliminary hearing, Rector knew the *defendant* had been convicted of second degree murder and had "failed" a lie detector test. That information as to the lie detector was given to him by the Prosecuting Attorney and as to the conviction may have been given to him earlier by an officer. Rector again identified the defendant at the preliminary as the assailant by pointing out the defendant seated at the counsel table. The same identification was made at trial. In all three identifications, the witness said that the defendant "looked exactly like the man who did it." At trial Rector conceded that he could be no more positive than the "looked exactly like" characterization, although in response to the prodding by the prosecutor he finally said, "This is the man I saw."

The proceedings at the lineup and the information given to Rector as to the defendant's record and purported failure of the lie detector test were highly suggestive. Rector knew a suspect was in custody and the defendant was the only person that he could possibly identify as the assailant. His two companions were even more likely to have picked out the defendant since they knew all of the persons in the lineup except the defendant. The photograph of the lineup indicates that there is no similarity of build and age between the defendant and the others. The defendant is the only person in the lineup even close to the physical description of the assailant. The three eyewitnesses viewed the lineup together, and each proclaimed aloud the choice of the defendant. The circumstances were mutually reinforcing to all of them in the identification procedures, particularly since Rector's two companions knew all the men in the lineup except the defendant. Immediately after the lineup Rector and his companions were informed that they had picked the "right one" because he had a record for second degree murder. Later all of them learned that the defendant had "failed" a lie detector test. These suggestive matters were reiterated by the prosecuting attorney just before the preliminary hearing.

There is no need to reiterate in detail all of the case law relating to this issue. The question is one of Federal constitutional law. The test to determine if the due process right of the defendant is offended is set forth in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The court set forth the test at 114 as follows:

We therefore conclude that *reliability is the linchpin* in *determining* the *admissibility of identification testimony* for both pre- and post-*Stovall* confrontations. The factors to be considered are set out in *Biggers.* 409 U.S., at 199–200, 93 S.Ct., at 382. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation and the time between the crime and the confrontation. Against these factors. is to be weighed the corrupting effect of the suggestive identification itself.

(Emphasis added.)

Thus, the test requires the weighing of the factors influencing reliability against the suggestiveness of the lineup or other police procedures. The "linchpin" language of the test has been repeated, without reference to the necessary balancing, in cases where the indicia of reliability were strong and the elements of suggestiveness were slight.

This case contains a very strong element of suggestiveness: first, there was a great dissimilarity in the build of the participants; second, Rector knew two of them and would have recognized them at the crime scene; and third, Rector himself said that the remaining participant could not

have been the assailant, leaving only the defendant to choose. In addition, the initial view by Rector lasted 15 seconds at a distance of 15 to 30 yards, occurred at night, with part of it from the back seat of a moving vehicle, and part of it during a chase to a darker part of the street. The time factor of only two weeks favors the lineup identification, but the accuracy of the description was weak except as to age and size. The level of certainty at confrontation was fairly strong but does not carry much persuasion in the light of the composition of the lineup. If only the lineup were suggestive, the case might be close. The reliability of the in-court identification is further undermined by the suggestion implicit in the officers informing the witness as to the defendant's prior record and "failure" to pass a lie detector test. Those factors added to the suggestiveness of the lineup compel the conclusion that the lineup and its sequelae created a substantial likelihood of irreparable misidentification in the in-court identifications.

I believe that even if this case were viewed as a plain error case, the result would be the same. The rule is without doubt that the erroneous admission of evidence is seldom harmless. *State v. Wright*, 582 S.W.2d 275 (Mo. banc 1979). In this case, where the only other identification testimony is inadmissible or at the very least highly suspect, manifest injustice occurs when evidence of both in-court and out-of-court identifications is permitted in the light of the suggestiveness present in this case. To permit what seems to be a substantial likelihood that irreparable misidentification caused by the suggestion in the procedures utilized to ripen into firm identification is a denial of due process.

The question as to the initial balancing of suggestiveness versus reliability of the victim's testimony is only slightly different. Her opportunity to observe may have been better. She stated that she viewed the defendant for 2–3 minutes. However, she retreated from this slightly when pressed. In any event she testified that she observed the defendant only when he approached her from a distance she estimated as 15 yards. She is 69 years old and was no doubt terri-fied at the sudden attack on the street at night. She said in the initial interview with the police that she could not identify her assailant. She was unable to give a physical description and in fact gave as the only physical characteristic a "light skin Negro," which does not accurately describe the defendant. She viewed the lineup twice. Her identification language was, "That's him or it looks like him." At the suppression hearing, she said two of the participants were older and heavier and did not look anything like her assailant and that the other participant besides the defendant did not look anything like her assailant because he was so small. This testimony is consistent with the photograph of the lineup, which displayed the characteristics she described. She, too, was aware of the suggestive factors involving the defendant's record and supposed failure of the lie detector test.

As to this witness, the only issue is error since the claim is preserved. I am convinced that the lineup was suggestive, that suggestion was reinforced, and that the indicia of reliability are not strong enough to convince that a substantial likelihood of irreparable misidentification did not occur.

I would reverse the conviction.